MEC PENNSYLVANIA RACING, INC., Mountain Laurel Racing, Inc., and Washington Trotting Association, Inc., Petitioners,

v.

PENNSYLVANIA STATE HORSE RACING COMMISSION, Respondent.

Mountainview Thoroughbred Racing Association, Pennsylvania National Turf Club, Inc., Penn National Race Course, The Downs Racing, Inc., and Pocono Downs, Petitioners,

v.

State Horse Racing Commission, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 7, 2003.

Decided June 26, 2003.

As Amended July 15, 2003.

Raymond A. Quaglia, Philadelphia, for petitioner, PA National Turf Club, Inc.

Mark S. Stewart, Harrisburg, for petitioner, MEC Pennsylvania Racing Inc.

Alan J. Davis, Philadelphia, for petitioner, Mountainview Thoroughbred Racing Assoc.

Jorge Augusto and Richard D. Sherman, Harrisburg, for respondent.

G. Thompson Bell, III, Reading, for intervenor, Presque Isle Downs Inc.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Penn National [1] and MEC [2] (collectively, Objectors) petition for review from an or-

---

1. Penn National is collectively comprised of Mountainview Thoroughbred Racing Association (Mountainview); Pennsylvania National Turf Club, Inc. (PNTC); Penn National Race Course; The Downs Racing, Inc. (The Downs Racing); and Pocono Downs. Mountainview and PNTC are licensees of the Pennsylvania State Horse Racing Commission under the Race Horse Industry Reform Act, *infra*. They conduct thoroughbred racing with pari-mutuel wagering at Penn National Race Course in Grantville, Pennsylvania, along with having

der of the Pennsylvania State Horse Racing Commission (Commission) approving the application of Presque Isle Downs, Incorporated (Presque Isle) for a license to conduct horse racing meetings with pari-mutuel wagering in Erie, Pennsylvania under the Race Horse Industry Reform Act (Reform Act), Act of December 17, 1981, P.L. 435, 4 P.S. § 325.101–325.402.[3]

On June 20, 2001, Presque Isle submitted an application to the Commission for a license to conduct horse racing meetings with pari-mutuel wagering (Application). In support of the Application, Presque Isle submitted 32 exhibits detailing a plan to construct a racing facility on property located 3.5 miles from the Downs at Erie, for which it had an option to purchase. Following published notice, the Commission conducted an open meeting at an Erie hotel on October 9, 2001, to solicit the public's comments regarding the Application. A total of 25 individuals participated, including MEC, Penn National, Philadelphia Park Racetrack, Representative Karl Boyes, Representative John Evans, Roy Wilt, Chairman of the State Harness Racing Commission, Pennsylvania Thoroughbred Horsemen's Association, and Pennsylvania Harness Horsemen's Association. Cross-examination was not allowed. During the meeting, the Commission stated that all comments and documents concerning the Application should be received by December 11, 2001. In addition, the Commission distributed a procedural schedule for the consideration of Presque Isle's Application. The schedule called for the submission of any additional written materials by November 8, 2001; replies to the written submissions by November 26, 2001; and proposed findings of fact and memoranda of law by December 11, 2001. Additional submissions, as well as findings of fact and memoranda, were filed by Presque Isle, MEC and Penn National.

On February 21, 2002, MEC filed a request with the Commission for a formal hearing, with cross-examination of wit-

---

also established six off-track-wagering (OTW) facilities as "non-primary locations" under the Reform Act. The Downs Racing conducts harness racing near Wilkes–Barre at Pocono Downs and has also established five OTW facilities as non-primary locations. Among those non-primary locations is The Downs at Erie, which generates approximately $900,000 to $1,000,000 a year for the harness horsemen's purse account at Pocono Downs.

2. MEC is collectively comprised of MEC Pennsylvania Racing, Inc., Mountain Laurel Racing, Inc., and Washington Trotting Association, Inc. MEC owns two of the Commonwealth's four live racetracks, not to mention approximately two-thirds of the OTW facilities.

3. The Reform Act provides a comprehensive scheme for licensing and regulating horse racing and associated wagering in Pennsylvania. It provides for the establishment of the Commission, which oversees thoroughbred horse racing, and the State Harness Racing Commission (SHRC), which oversees harness racing. 4 P.S. §§ 325.201, 325.202. No corporation may conduct any horse racing and pari-mutuel wagering unless a license has been granted to it by the appropriate commission. 4 P.S. §§ 325.203, 325.209. Upon application, a license may issue "if, in the judgment of the appropriate commission, the public interest, convenience or necessity will be served and a proper case for the issuance of the license is shown." 4 P.S. § 325.209(a). The Reform Act then specifies a number of conditions which must be met in order for the license to be issued, including information on the facility, ownership interests and financial backing. See 4 P.S. § 325.209(b), (c), (d), (e) and (f).

The Reform Act limits the number of licenses to be issued by the two commissions, providing that no more than six corporations shall be licensed by the Commission, and no more than five corporations shall be licensed by the SHRC. 4 P.S. § 325.205. Through the summer of 2001, only four of the six thoroughbred horse racing licenses had been issued by the Commission.

nesses, in compliance with the Administrative Agency Law (AAL), 2 Pa.C.S. §§ 501–508, 701–704,[4] along with a period for pre-hearing discovery, which the Commission denied on April 9, 2002. On February 25, 2002, the Commission expressed its intention to rule on Presque Isle's Application at its March meeting; however, prior to that meeting, the Commission granted a request by Presque Isle to delay ruling on its Application so that it could provide additional information. On May 1, 2002, Presque Isle filed another submission, and, in response, the Objectors made separate filings with the Commission, objecting to certain aspects of Presque Isle's submission and asking for an extension of time in which to respond. Additionally, in its filing, MEC also repeated its request for a formal hearing with cross-examination and a period of pre-hearing discovery. Following the submissions, the Commission issued a notice requiring that any additional submissions concerning the Application to be filed by June 15, 2002. On June 13, 2002, Presque Isle filed an additional submission and the Objectors filed responses repeating their prior requests.

On July 2, 2002, the Commission issued a notice that the deadline for final submissions was August 15, 2002. Following that notice, Penn National formally objected to

all of Presque Isle's supplemental submissions and requested that the Commission refrain from considering them. Penn National also requested that the Commission decline to accept any further submissions from Presque Isle. MEC made a similar filing, echoing Penn National's objections, as well as, once again, raising the need for a formal hearing with cross-examination and pre-hearing discovery. On August 14 and 15, 2002, the Objectors filed their final submissions with the Commission.[5]

On November 19, 2002, the Commission issued its final order (Order) approving Presque Isle's application. In its Order, the Commission concluded that the Presque Isle facility furthered the interests of the horse-racing industry, and that the benefits of the new facility outweighed any detrimental impact to Penn National's The Downs at Erie facility, despite finding that "[t]he proposed facility will have a detrimental impact on the handle at The Downs at Erie OTW." (Finding of Fact No. 53). The Objectors filed requests for reconsideration with the Commission. Specifically, MEC asked the Commission to revisit its decision and afford the participants to the Presque Isle proceeding a formal due process hearing; however, the Commission never ruled on the reconsideration re-

---

**4.** The AAL requires that testimony be stenographically recorded, that a full and complete record be kept of the proceedings, and that affected parties be afforded reasonable examination and cross-examination. 2 Pa.C.S. §§ 504, 505. Moreover, in compliance with due process requirements, interested parties are entitled to know the claims of other parties to the proceedings, to hear the evidence adduced against them, to introduce evidence on their own behalf, and to present an argument in support of their position. *Callahan v. Pennsylvania State Police*, 494 Pa. 461, 431 A.2d 946 (1981).

**5.** The following is some of the evidence the parties opposing the Application presented to

the Commission: MEC presented expert and industry testimony alleging that the addition of the new track in Erie would result in diluted attendance and revenue for all other Pennsylvania horse and harness racetracks. It also submitted expert studies indicating that if the Commission granted the Application, there would be a significant erosion of MEC's live racing and OTW customers, particularly, its most reliable customers. Penn National presented correspondence it received from Presque Isle, which admitted that Penn National's two-year losses could reach $1.9 million resulting from the commencement of live thoroughbred racing in Erie and concomitant closure of The Downs at Erie.

quests. On December 19, 2002, the Objectors filed separate petitions for review of the Commission's Order with this Court and they were subsequently consolidated.[6] Presque Isle filed a motion to quash the Objectors' appeals contesting their right to appeal, and if they did have such a right, whether they had standing.

In *Man O'War Racing Association, Incorporated v. State Horse Racing Commission*, 433 Pa. 432, 250 A.2d 172 (1969), our Supreme Court addressed almost identical issues of due process and whether the decision was supported by substantive evidence, as well as a motion to quash based on a lack of a right of appeal and standing. While, admittedly, *Man O'War* was decided over 30 years ago and much has changed in the area of administrative law as the result of the enactment of Article V, Section 9 of the Pennsylvania Constitution,[7] we still find its structure and substance guiding, although we have to update its analysis to reflect changes in administrative law since that time. Like our Supreme Court in *Man O'War*, we will address the motion to quash issues prior to undertaking a review on the merits. Basically, the issues raised may be grouped into two categories—whether an appeal lies from the decision of the Commission and whether the Objectors have standing to challenge the decision even if an appeal lies.

## I.

## A.

In its motion to quash, echoing the issue in *Man O'War*, Presque Isle contends that the Objectors do not have a right to appeal from the Commission's decision because there is no such right provided for in the Reform Act. In response, the Objectors contend that because the Reform Act is silent as to the right of appeal, the procedures set forth in the AAL apply. While the short answer to that question is that Presque Isle's framing of the issue was made "obsolete" by the adoption of Article V, Section 9 of the Pennsylvania Constitution in 1968, making all state administrative agency adjudications appealable, because of our reliance on the *Man O'War* analysis in other areas, a more detailed explanation is useful.

In *Man O'War*, the then-applicable licensing statute, like the Reform Act at issue in this case, allowed for an appeal if the Commission refused to grant a license application or revoked or suspended a license; however, it did not contain any provision that addressed appeals taken from the *grant* of a license. In deciding to determine whether the grant of the appeal was proper, it stated:

> The law in this Commonwealth is quite clear on the right to appeal from decisions of administrative bodies when the legislation does not explicitly provide

---

**6.** This Court's review of an order of the Commission is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Pinero v. Pennsylvania State Horse Racing Commission*, 804 A.2d 131 (Pa.Cmwlth.2002).

**7.** Article V, Section 9 of the Pennsylvania Constitution provides:
There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law.
Article V, Section 9, though, is not self-executing. *Manheim Township School District v. State Board of Education*, 1 Pa. Cmwlth. 627, 276 A.2d 561 (1971).

for such a right. If an appeal is prohibited by an act, or the decision of an agency is described as final or conclusive, an appeal may be taken to the courts in the nature of narrow certiorari. In this type of appeal our inquiry is limited to questions of jurisdiction, the regularity of the proceedings, and constitutional issues. *Keystone Raceway Corp. v. State Harness Racing Commission,* 405 Pa. 1, 173 A.2d 97 (1961); *Delaware County National Bank v. Campbell,* 378 Pa. 311, 106 A.2d 416 (1954). On the other hand, if the legislation is silent as to the right of appeal or does not say that the decision of the administrative agency shall be nonappealable, an appeal may be taken in the nature of broad certiorari. In these cases "the court may consider the record, including the testimony, to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made." *Delaware County National Bank v. Campbell,* 378 Pa. at 317–18, 106 A.2d at 419; *Keystone Raceway Corp. v. State Harness Racing Commission,* 405 Pa. at 6, 173 A.2d at 99; *Ritter Finance Co., v. Myers,* 401 Pa. 467, 165 A.2d 246 (1960).

433 Pa. at 437, 250 A.2d at 174–175. Because of this silence in the *Man O'War* statute, our Supreme Court held that an appeal was allowed from the Commission in the nature of broad certiorari, meaning that the Court could review to see if competent evidence supported the inquiry.

As we previously stated, the *Man O'War* appeal originated prior to the adoption of Article V, Section 9 of the Pennsylvania Constitution that gave a right to appeal all administrative agency decisions. Until this provision, no appeal was allowed from a state agency unless it was one of the 48 state agencies from which an appeal could be taken listed in the now repealed 71 P.S. § 1710.51(a). Decisions of bodies not listed could not be appealed as of right unless the statute that had established the agency had created a supplementary right of appeal. For example, in *Department of Labor and Industry v. Snelling & Snelling,* 89 Dauph 51 (1968), it was held that the AAL's appeal procedures did not apply to a labor department decision denying a partial refund of license fees because the department was not one of the listed agencies.

For those state agencies not listed, as well as all local agencies, an appeal was only allowed by permission by filing a writ of certiorari. Originally, the writ of certiorari was limited to an inspection of the record for jurisdiction below and for correction of errors appearing on the face of the record; neither the opinion of the court below nor the evidence in the case formed any part of the record, and the merits could not be inquired into on certiorari. This became known as "narrow certiorari" and only looked at the fairness of the proceeding, not the outcome. Our Supreme Court later developed a "broad certiorari" in which the appellate court looked beyond the jurisdiction of the court below and regularity of the proceedings to determine, by examining the testimony, whether the findings of the court below were supported by evidence or whether it was guilty of an abuse of discretion or an error of law. It was later codified in Supreme Court Rule 68½.

Whether narrow or broad certiorari was employed was explained by our Supreme Court in *Official Court Reporters of Court of Common Pleas of Philadelphia County v. Pennsylvania Labor Relations Bd.,* 502 Pa. 518, 528, 467 A.2d 311, 316 (1983), stating:

[P]rior to the enactment of Article V, section 9 of the Pennsylvania Constitu-

tion which provides for a right of appeal from administrative agency decisions, the right to appeal from such agency decisions stemmed from either the agency's enabling legislation or the Administrative Agency Law. In the absence of a statutory right to appeal we reviewed agency decisions on broad certiorari, except when an appeal was prohibited by statute, in which case we limited our review to narrow certiorari. (citation omitted.)

After the enactment of Article V, Section 9 of the Pennsylvania Constitution, the AAL[8] was changed to govern the procedures of all appeals that were allowed from all state agencies unless there was a specific alternative procedure set forth in the authorizing statute.[9]

#### B.

The reason for the previous explanation is because once it decided that an appeal could be allowed, our Supreme Court in *Man O'War* went on to consider whether the order was one that could be appealed. It stated that in order "for an appeal by certiorari to lie the order or action of the agency, board or commission *must be judicial in nature.*" *Man O'War*, 433 Pa. at 438, 250 A.2d at 175 (*quoting Keystone Raceway*, 405 Pa. at 6, 173 A.2d at 100).

(Emphasis in original). In reviewing the Commission's Order, the Supreme Court determined that the approval of the horse racing license was judicial because: (1) the statute under which the Commission operated required it to judge the merits of each applicant in terms of statutory standards, and the Commission had quasi-judicial characteristics in that it had the power to administer oaths, examine witnesses, and subpoena witnesses and materials; (2) the decisions of the Commission "are so fraught with the public interest that an appeal must lie," *Man O'War*, 433 Pa. at 439, 250 A.2d at 176; and (3) a license is a valuable privilege which could be substantially affected by the Commission's decision.[10]

■ Because we are now applying the AAL, our Supreme Court's terminology in addressing whether the agency's actions as "judicial" in nature to determine whether it is appealable has been supplanted by the term "adjudication;" however, its analysis is still applicable to determine whether the Commission's Order was an adjudication. Like the Commission's decision in *Man O'War*, in this case, the Commission's action: (1) required it to judge the merits of each applicant based on statutory standards, 4 P.S. § 325.209, and allowed the

---

**8.** 2 Pa.C.S. § 702 provides: "[a]ny person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals. . . ."

**9.** 2 Pa.C.S. § 106 provides: "[n]o subsequent statute shall be held to supersede or modify the provisions of this title except to the extent that such statute shall do so expressly."

**10.** In discussing this third reason as to why the Commission's Order was judicial, the Supreme Court stated that:

[A license] is a very valuable privilege, even though it calls for a substantial invest-

ment. In addition, those who have sought a grant have expended large sums of money—both for the application fee and in the preparation of the extensive application. In a real sense the ultimate decision of the Commission in each instance involves large sums of money both private investment and public revenues. It is our view that the determination of the Commission, involving as it does such great and important stakes, reinforces appellant's position that *our Court can and should review the decision of the Commission.*

*Man O'War*, 433 Pa. at 441, 250 A.2d at 176. (Emphasis added).

Commission to administer oaths, examine witnesses and subpoena witnesses and materials, 4 P.S. § 325.226; (2) was completely intertwined with the public interest, because the Commission's decision will result in the raising of large amounts of tax revenue; and (3) affects a license—a valuable privilege. Under the AAL, an administrative "adjudication" is defined as "any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, ... of any or all of the parties to the proceeding ..." 2 Pa.C.S. § 101.[11] A "party" is "[a]ny person who appears in a proceeding before an agency who has a direct interest in the subject matter of such proceeding." 2 Pa.C.S. § 101. Under that definition, there is no dispute that, at a minimum, Presque Isle, having a direct interest in the proceeding, could then appeal to this Court because the Commission's Order was an adjudication under the AAL. *See also Turner v. Pennsylvania Public Utility Commission,* 683 A.2d 942 (Pa.Cmwlth.1996).[12]

## II.

The question then becomes who has standing to appeal the Commission's Order. Presque Isle contends in its motion to quash that MEC and Penn National were not aggrieved by the Order of the Commission; therefore, they lack standing. In *Man O'War*, our Supreme Court set forth the traditional standing test, stating:

> [The party] must have a direct interest in the subject-matter of the particular litigation, otherwise he can have no

standing to appeal. And not only must the party desiring to appeal have a direct interest in the particular question litigated, but his interest must be immediate and pecuniary, and not a remote consequence of the judgment. The interest must also be substantial.

433 Pa. at 441–442, 250 A.2d at 176–177 (*quoting Keystone Raceway,* 405 Pa. at 7–8, 173 A.2d at 100). A party has a direct interest if the adjudication "causes harm to an interest of his." *Pennsylvania Automotive Association v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 121 Pa.Cmwlth. 352, 550 A.2d 1041, 1043. "[T]he requirement of a 'substantial' interest simply means that ... there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law." *William Penn Parking Garage Incorporated v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975).

The same traditional standing test also applies to determine if a party has standing to pursue an appeal from an administrative agency under Section 702 of the AAL.[13] Section 702 provides that "[a]ny person aggrieved by an adjudication of the Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal." 2 Pa.C.S. § 702. More recently, this Court, in *Cashdollar v. State Horse Racing Commission,* 143 Pa. Cmwlth. 650, 600 A.2d 646 (1991), granted standing to the residents of a "local community" who were opposed to an off-track betting (OTB) site approved by the Com-

---

**11.** The definitional section of Title 2, 2 Pa. C.S. § 101, applies to both the Local Agency Law, 2 Pa.C.S. §§ 551–551, 751–754, and the AAL.

**12.** This Court has previously applied the AAL to adjudications of the horse racing commissions. *See Meyer v. State Horse Racing Commission,* 72 Pa.Cmwlth. 495, 456 A.2d 1164

(1983); *Reichard, V.M.D. v. State. Harness Racing Commission,* 92 Pa.Cmwlth. 445, 499 A.2d 727 (1985).

**13.** *See Bankers Life and Casualty Company v. Unemployment · Compensation Board of Review,* 750 A.2d 915 (Pa.Cmwlth.2000).

mission. In that case, we reasoned that the Reform Act explicitly required the Commission to consider the public interest in its decision to grant or deny a license. *See* 4 P.S. § 325.209.[14] This Court held that where an administrative agency was directed by its enabling statute to take into consideration the effect of its decision upon a particular class of individuals, then those individuals might have standing to challenge the agency's decision on the basis that it did not fulfill its statutory duty.[15]

■ Under *Cashdollar* and the traditional standing test, Penn National clearly has a direct, substantial and immediate interest. Not only did the Commission find that Presque Isle's proposed facility would have a detrimental impact on Penn National's The Downs at Erie, but, additionally, Presque Isle itself offered to: (1) purchase The Downs at Erie to reimburse Penn National for its lost investment; and/or (2) contribute $1.9 million to "protect" the harness horsemen at Pocono Downs for two years "from purse reductions occasioned by our commencing live racing in Erie ... and closing of Penn National's OTB facility in Erie." (Reproduced Record at 1758a). Because both the Commission and Presque Isle acknowl-

edged a pecuniary harm to Penn National's interest resulting directly from the grant of the Application, Presque Isle's motion to quash as to Penn National is denied.

■ MEC also has standing because it demonstrated that the development of a new live racetrack in Erie would result in a direct dilution of attendance and revenue at its own racetracks, as well as adversely impact the racing industry as a whole, including an overall decline in the horse supply for the Mid–Atlantic region. The loss of attendance and revenue will harm a direct, substantial and immediate interest of MEC's. Moreover, in its decision, the Commission extensively discussed why, under 58 Pa.Code § 165.18,[16] the Presque Isle Application was in the "best interest of horse racing."[17] It follows from this discussion that MEC, which makes up approximately one-third of all OTW facilities and one-half of all live racing facilities in the Commonwealth, has standing, like the "local community" in *Cashdollar*, to appeal. Because of MEC's undeniable involvement with horse racing, it clearly has a direct interest in any license adjudication

---

**14.** 4 P.S. § 325.209 provides, in relevant part:

The license does not give its holder a property right. If, in the judgment of the appropriate commission, the public interest, convenience or necessity will be served and a proper case for the issuance of the license is shown, the appropriate commission may issue the license.

**15.** *See e.g. Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979). In *Biester*, our Supreme Court, in granting standing to taxpayers who did not meet the traditional standing test, stated that, "the fundamental reason for granting standing is simply that otherwise a large body of governmental activity would be unchallenged in the courts." 487 Pa. at 445, 409 A.2d at 852. The Court reasoned that because the parties who were directly and

immediately affected by the complained of government conduct were beneficially affected, as opposed to adversely affected, the issue was likely to escape judicial review.

**16.** 58 Pa.Code § 165.18 provides, in relevant part: "In considering an application for a license, the Commission may, among other things, give consideration to ... the public interest, convenience, or necessity and the best interests of racing generally."

**17.** The Commission's Order extensively discussed why it had concluded that the Presque Isle facility would be in the "best interest of racing;" however, we are skeptical as to how the Commission could make such a fact-based determination while at the same time arguing that MEC had no interest in the outcome of the proceeding.

affecting those interests in the Commonwealth.[18]

## III.

■ Despite having determined that a right to appeal exists, that the Commission's Order was an adjudication, and that the Objectors have standing to appeal, the issue then becomes whether each has a right to a trial-type hearing guaranteed by Sections 504 and 505 of the AAL. Because we have found that the grant of a license is an adjudication, *see e.g., Man O'War* and *Cashdollar*, the Commission is required to conduct its hearings in accordance with Sections 504 and 505 of the AAL.[19] The Commission, however, contends that only "parties" to the adjudication are granted a trial-type hearing under Sections 504 and 505 of the AAL. It argues that under 58 Pa.Code § 165.171(a),[20] only an "applicant" such as Presque Isle is considered a "party" and has any right to a hearing.[21]

Although under 58 Pa.Code § 165.171(a), the Objectors are not considered parties, that is neither the controlling definition nor can it be used to "box out" persons who are aggrieved. In any event, 58 Pa.Code § 165.171(a) defines a "party" as applied to the Reform Act while the definition of "party" under 2 Pa.C.S. § 101, *supra,* applies to the AAL. Because we have already found that the Objectors have a direct interest in this appeal for the purposes of standing, it follows that they also have a "direct interest in the subject matter" of the proceeding entitling them, as a "party" to a formal hearing, with cross-examination.

## IV.

Even if the Objectors are entitled to a trial-type hearing, Presque Isle and the Commission argue that each has waived that issue. Because whether or not the Objectors waived their rights to a full trial-

**18.** In its reply, MEC argued that Presque Isle's motion to quash for lack of standing should be denied because the issue was not raised below and, therefore, was waived. *See* Pa. R.A.P. 302. While it is true that the issue of standing was not raised below, we find it significant that no formal hearing was conducted below either. The only "hearing" held was a public meeting at which virtually every person had a right to participate, regardless of whether or not they have a direct interest in the final outcome; therefore, it would have been improper for Presque Isle to contest MEC's standing at that point in time.

**19.** 2 Pa.C.S. § 504 provides:

No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard. All testimony shall be stenographically recorded and a full and complete record shall be kept of the proceedings.

2 Pa.C.S. § 505 provides: "Commonwealth agencies shall not be bound by technical rules of evidence at agency hearings, and

all relevant evidence of reasonably probative value may be received. Reasonable examination and cross-examination shall be permitted."

**20.** 58 Pa.Code § 165.171(a) defines "party" as "the Commonwealth, the Commission, an applicant who is refused a license, a licensee whose license is suspended or revoked or a person designated in a citation as a respondent."

**21.** This regulation implements 4 P.S. § 325.226, which provides, in relevant part, that:

[i]f the commissions refuse to grant any license applied for under this act, or shall revoke or suspend any license granted, the applicant or licensee may demand, within ten days after notice of the decision of the appropriate commission, a hearing before the appropriate commission. The commission shall give prompt notice of the time and place for the hearing at which time the commission will hear the applicant or licensee.

type hearing under the AAL is a threshold issue, we will address that issue first.

■ As to MEC, the Commission and Presque Isle argue that even if MEC does have a right to a "formal" hearing, it waived that right by failing to object to the procedures in a timely fashion during the hearing before the Commission. In support of their waiver arguments, the Commission cites to *Man O'War* and Presque Isle cites *Cashdollar*, both holding that the appellant had waived its objection to the procedures of the Commission for timeliness. In reviewing those cases, we feel this situation is distinguishable on several points. First, in *Man O'War*, the appellant never requested a hearing with cross-examination prior to raising the issue for the first time on appeal. The Supreme Court faulted the appellant for "sitting silently when an opportunity was presented to object ... at a much earlier stage of the proceedings," *Man O'War*, 433 Pa. at 445, 250 A.2d at 178, and emphasized that it had "failed to raise these objections at any time below." *Id.*, 433 Pa. at 448, 250 A.2d at 180. Moreover, included by the Court in the acceptable "earlier stages" was a post-public meeting comment period.[22] In this case, MEC made multiple requests for a "formal" hearing in accordance with the AAL during the "post-public meeting comment period."

Furthermore, in this case, the Commission itself explicitly raised the expectation of additional hearings to be held *after* the initial public meeting as part of its procedural guidelines.[23] Therefore, even under its own guidelines, asking for a hearing after the public meeting was not only proper, but anticipated. Additionally, af-ter MEC's first request for a "formal" hearing, the Commission decided to accept substantial additional submissions from Presque Isle, including entirely new financial projections and an economic impact study. Once the Commission reopened the record—to the extent it was ever really closed—for these submissions, MEC renewed its request that the Commission comply with Sections 504 and 505 of the AAL at every possible opportunity.

Similarly, in *Cashdollar*, this Court found that an appellant who waited until after the Commission approved an OTW had waived her rights to a formal hearing with cross-examination. Although we did state that the appellant should have objected during the public meeting, we did not restrict the time for objecting exclusively to during that meeting and, instead, seemed to focus on the fact that the appellant only objected once a decision, adverse to appellant's position, was rendered. Unlike the appellants in *Man O'War* and *Cashdollar*, MEC made frequent requests of the Commission to adhere to the AAL up to eight months *prior* to its vote to grant the Application.

Because MEC was a party and its request was timely, and the Commission did not comply with the AAL when it rendered its Order, the Commission's Order is vacated. This case is remanded for a formal hearing to be conducted in accordance with the AAL.

## V.

### A.

■ Unlike MEC, who raised the hearing issue before the Commission prior to

---

22. The Supreme Court stated that "[i]n response to [the Chairman's] request for written comments after the meeting, appellant filed nothing." *Man O'War*, 433 Pa. at 448, 250 A.2d at 180.

23. The Commission's procedural guidelines specifically allowed for a "Second Commission meeting: to be determined by the Commission if necessary. There is no specific timeframe for the Commission to render adjudication." (Reproduced Record at 1400a).

its determination, Penn National never requested a "formal" hearing before the Commission or in its petition for review or in its brief to this Court; instead, it only requested a remand at oral argument. Having not properly preserved the issue, like the appellant in *Man O'War*, Penn National has also waived its argument for remand with a new formal hearing. 2 Pa.C.S. § 703;[24] *see also* P.R.A.P. 1551;[25] *Man O'War; Cashdollar.*

## B.

Consequently, we will now go on to address Penn National's appeal on the merits as the record now exists, without it having any preclusive effect on MEC's appeal. First, Penn National contends that the Commission failed to consider the "best interest of racing" and the "interest of the public" in granting the Application because Presque Isle's facility will divide the existing horse-racing market or, even worse, could fail altogether.

■ Even just a cursory review of the record and the Commission's Order clearly shows a reasoned decision by the Commission that any detrimental impact resulting from the new license will be "clearly outweighed by the creation of a new venue for live racing in the Commonwealth," (Commission's Order at 14), and that Presque Isle's entrance into the racing industry would be in the best interest of Pennsylvania horse racing.[26] Moreover, these claims ignore the fact that Pennsylvania's General Assembly specifically authorized six thoroughbred track licenses in Pennsylvania, 4 P.S. § 325.205(a). It is implicit within the granting of those six licenses that attendance and revenue would be divided to some extent among all of the tracks. Finally, the Commission also reasoned that the failed attempts at bringing live racing to Erie in the past were not relevant to the present situation because the past attempts: (1) involved different corporations; (2) did not have the benefit of Telephone/Internet wagering; and (3) did not have the draw of a multi-purpose entertainment facility.

■ Second, Penn National contends that the Commission's approval of the Application constituted a *de facto* taking without compensation of its OTW Erie facility, The Downs at Erie. In a *de facto* takings claim, a property owner bears a heavy burden of proof and must demonstrate that exceptional circumstances exist which substantially deprive them of the use of their property, and further, that such deprivation is the direct and necessary consequence of the actions of the entity having the power of eminent domain. *Snap–Tite, Incorporated v. Millcreek Township,* 811 A.2d 1101 (Pa.

---

**24.** 2 Pa.C.S. § 703 provides, in relevant part:
(a) **General rule.**—A party who proceeded before a Commonwealth agency under the terms of the particular statute shall not be precluded from questioning the validity of the statute in appeal, but such party may not raise upon appeal any other question not raised before the agency (notwithstanding the fact that the agency may not be competent to resolve such question) unless allowed by the court upon due cause shown.

**25.** P.R.A.P. 1551 provides, in relevant part, that "[r]eview of quasijudicial orders shall be heard by the court on the record. No question shall be heard or considered by the court which was not raised before the government unit."

**26.** In its Order, the Commission specifically discussed the market research provided by Presque Isle, as well as how Erie was one of the largest cities in the Commonwealth and how the Presque Isle facility would be the only live horse-racing site in the Northwest region of the State, thereby generating new excitement and interest in the area.

Cmwlth.2002). A taking does not occur, however, merely because a regulation deprives an owner of the most profitable use of his or her property. Rather, the regulation must substantially deprive the landowner of all beneficial use and enjoyment of his property. *Fisher v. Cranberry Township Zoning and Hearing Board,* 819 A.2d 181 (Pa.Cmwlth.2003).

■ Because any property rights in a horse racing license have specifically been withheld by the legislature, 4 P.S. § 325.209(a), Penn National has no inherent property interest in its license to conduct OTW. Consequently, Penn National does not have, nor could it allege, a property right or a *de facto* taking of that "property." Even assuming that a property right exists, just because it has the only license in the Erie area, thereby creating a monopoly over that region's wagering activities, Penn National does not suffer a taking if the Commission grants other licenses. If that were the case, every liquor licensee could seek compensation every time another liquor license was granted nearby.

■ Finally, Penn National contends that the Commission abused its discretion by approving Presque Isle's new facility only 3.5 miles from The Downs at Erie and by relying on insufficient evidence. While the Reform Act prohibits the establishment of an OTW facility within a 35-mile radius of an existing track, the Reform Act does not contain any prohibition on licensing a primary track within a designated distance of an existing OTW. In fact, the

Reform Act contemplates that two primary tracks may be within the 35-mile radius. *See* 4 P.S. § 325.218(d), (e); *Man O'War* (stating that due to the large population center in the Philadelphia area, it was a possibility that the Commission would allocate more than one license to the area).[27]

Because the Commission failed to comply with the AAL when it denied MEC the right to a formal hearing, the Commission's Order is vacated and this matter is remanded for a formal hearing in accordance with the AAL. Because Penn National has waived its argument that it did not receive a trial-type hearing and, on the merits, the Commission did not commit an error of law, Penn National's Petition for Review is denied.

### *ORDER*

AND NOW, this *26th* day of *June,* 2003, the order of the Pennsylvania State Horse Racing Commission, dated November 19, 2002, with regard to MEC Pennsylvania Racing, Inc., Mountain Laurel Racing, Inc., and Washington Trotting Association, Inc., is vacated and remanded for a formal hearing in accordance with the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704. As to Mountainview Thoroughbred Racing Association, Pennsylvania National Turf Club, Inc., Penn National Race Course, The Downs Racing, Inc., and Pocono Downs, their Petition for Review is denied.

Presque Isle Downs, Incorporated's motion to quash is denied.

Jurisdiction relinquished.

---

**27.** 4 P.S. § 325.218(d) provides, in relevant part:

> Nothing herein shall prohibit the licensed corporation from accepting a telephone wager from, or establishing a telephone betting account for, any person located in or residing in the primary market area of the track at which the licensed corporation is conducting a meeting and, *if two tracks*

> *share primary market area as defined herein, both tracks shall have equal rights to the market in the shared area.* (Emphasis added).

> 4 P.S. § 325.218(e) provides, "The primary market area of a race track, for purposes of [the Reform Act], is defined as that land area included in a circle drawn with the race as the center a radius of 35 air miles."

CONCURRING AND DISSENTING OPINION BY President Judge COLINS.

I agree with the majority's conclusion with respect to MEC Pennsylvania Racing, but I dissent with respect to Penn National. In both cases, I would vacate and remand for a full due process hearing.

DISSENTING OPINION BY Judge LEAVITT.

With due respect to the majority, I dissent.

The Pennsylvania State Horse Racing Commission approved the application of Presque Isle Downs, Incorporated for a license to conduct horse races with pari-mutuel wagering in Erie, Pennsylvania. This determination,[1] however, is not a final order within the meaning of The Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704, and, therefore, it is prematurely presented to our appellate jurisdiction. I would transfer the Objectors' petition for review to the Commission with instructions to conduct an adjudicatory hearing on whether the Objectors have standing and, if so, whether their factual and legal claims have merit. This was the course followed in *Philadelphia County Medical Society v. Kaiser*, 699 A.2d 800 (Pa.Cmwlth.1997), and it is the correct response here, where, again, we are presented with a determination that is preliminary, not final. In this administrative appeal, the Objectors should bear the burden of demonstrating the errors of the Commission in granting the license. However, the determination should not, pending administrative appeal, be vacated.

---

1. The fact that the determination is labeled "adjudication" is of no moment. A true adjudication must be preceded by a formal administrative hearing that results in a final order that this Court can review in its appellate jurisdiction.