IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Martin Ciresa,                              :
                                            :
                    Petitioner              :
                                            :
            v.                              : No. 1155 C.D. 2017
                                            : Argued: September 12, 2018
                                            :
Pennsylvania State Horse                    :
Racing Commission,                          :
                                            :
                    Respondent              :


BEFORE:     HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE ELLEN CEISLER, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                                 FILED:  January 17, 2019


            Martin Ciresa (Petitioner) petitions for review of the July 26, 2017
order of the Pennsylvania State Horse Racing Commission (Commission), which
affirmed the PARX Philadelphia Park (PARX) Board of Stewards' (Board)
December 5, 2016 ruling to disqualify Petitioner's horse, Cosmic Destiny (CD),
from purse money awarded in a race after the horse tested positive for a foreign
substance.  We affirm.

            Petitioner has participated in horse racing for approximately 30 years.
Findings of Fact (F.F.), March 28, 2017, No. 2.  On October 11, 2016, Petitioner
became the licensed owner of CD.  F.F. Nos. 1-2.  That same day, CD won first

place in the ninth race at PARX. *Id.* Following the race, and in front of two witnesses, urine and blood samples were taken from CD. F.F. No. 3.[1]

---

[1] Section 163.318 of the Commission's regulations provides:

(a) The test sample of the winner of each race and of horses finishing in the money in a race for which there is exotic wagering shall be taken, and a test sample shall be taken from other horses as the Commission or stewards may direct. If there is a problem in securing a test sample, the following procedures apply:

(1) A veterinarian may inject up to 1/2 cc. of Lasix to enhance securing a sample upon the written approval of the trainer.

(2) If a urine sample is not obtained in 2 hours and either the trainer or the veterinarian elects not to induce the sample by Lasix, a blood sample shall be taken upon the written approval of the trainer.

(3) In all cases a urine sample, a urine sample induced by Lasix or a blood sample shall be secured, regardless of delay involved.

(b) The urine or blood sample secured under the procedures as set forth in subsection (a), shall be split into two parts. One portion shall be delivered to the Commission's official chemist for testing. The remaining portion shall be maintained at the detention barn from where it was secured. Both portions shall be stored and shipped at the same range of temperatures and kept and transported in similar fashion.

* * *

(c) Upon application by the trainer or owner of the horse in question, the split portion of the sample taken shall be tested by a laboratory designated by the Commission and approved by the Horsemen's Benevolent and Protective Association.

**(Footnote continued on next page…)**

2

The Commission shipped a sample to the Pennsylvania Equine Toxicology and Research Laboratory (PETRL) for testing. *Id*. Following standard procedures, PETRL tested CD's plasma blood sample and discovered the presence of Carisoprodol, a skeletal muscle relaxant drug. F.F. Nos. 5, 6, 33. PETRL also detected Meprobamate, a known metabolite of Carisoprodol. F.F. No. 31. Under Section 163.302(a)(1) of the Commission's regulations,[2] Carisoprodol may not be present in a horse on race day. F.F. No. 5. CD's trainer received notice of the positive test results and exercised his right to have them confirmed by a second

---

**(continued…)**

> (d)    If the test confirms the findings of the original laboratory, it is considered to be a prima facie violation of the applicable provisions of this chapter.
>
>> (1) If the test of the split portion does not substantially confirm the findings of the original laboratory, the Commission will not consider the sample to constitute a prima facie violation of this chapter and no penalty will be imposed.
>>
>> (2) In order that the split sample be tested, the owners or trainers of the horse in question shall request in writing to the Commission that the split sample be retested. The request shall be received by the Commission within 48 hours after notification of the initial positive test or within a reasonable period of time established by the Commission after consultation with the original laboratory . . . .

58 Pa. Code §163.318.

[2] "A horse participating in a race may not carry in its body a substance foreign to the natural horse except as otherwise provided." 58 Pa. Code §163.302(a)(1).

laboratory. F.F. Nos. 7-8.[3] On November 7, 2016, in Petitioner's presence, the split sample was shipped from the state detention barn at PARX and submitted for drug analysis to Texas A&M Veterinary Medical Diagnostic Laboratory (Texas A&M Laboratory). F.F. No. 9. Texas A&M Laboratory also found the presence of Carisoprodol in CD's serum blood sample, which substantially confirmed the findings of PETRL. F.F. Nos. 10, 11, 35.

The Commission follows the guidelines of the Association of Racing Commissioners International (ARCI), which treats Carisoprodol as a class 2 drug and recommends disqualification and loss of purse money for a first offense, absent mitigating circumstances. F.F. Nos. 14-15. On December 5, 2016, the Board issued a ruling disqualifying CD from the ninth race and ordered redistribution of the purse money. F.F. No. 12. Petitioner appealed.

A hearing was held before a Commission hearing officer on March 28, 2017. Petitioner's expert, Dr. Thomas Tobin, Professor of Veterinary Science and Cancer Biology at the University of Kentucky, submitted a written report. Exhibit A-1, Attachment 5. In the report, Dr. Tobin relied on articles and data to support his assertions that: CD was exposed to Carisoprodol within the hour before the race; the amount of the drug found in the horse was miniscule; and, because the drug did not enhance CD's performance, the horse should not have been disqualified. Dr. Tobin opined that the source of Carisoprodol found in CD was a "random, inadvertent transfer of a trace amount from a human[-]related source." Exhibit A-1, Attachment 5.

---

[3] CD's trainer did not appeal a $2,500 fine that was imposed. F.F. No. 13. Pursuant to Section 163.309 of the Commission's regulations, owners and trainers have a responsibility to protect the horse against attempted administration of a prohibited substance.

4

Jason Klouser, Director of Enforcement for the Commission, testified at length about the general procedures for testing, handling, and preserving samples following races, and how these procedures were specifically applied in the instant case. Notes of Testimony (N.T.), March 28, 2017, at 15-62. Klouser stated that in every race, the first place horse is automatically tested for foreign substances. N.T. at 15. Klouser acknowledged that Section 163.318 of the Commission's regulations, 58 Pa. Code §163.318, called for all horses "finishing in the money" to be tested and required testing of four horses from the ninth race on October 11, 2016. N.T. at 60. However, he stated that the Commission's common practice is to test only the winning horse, and at most one other, if special circumstances arise. N.T. at 59, 60.

Klouser stated that Carisoprodol is a forbidden substance on race day. N.T. at 37. He also rejected Petitioner's interpretation of Section 163.313 as identifying urine as the "primary" testing sample, stating that "obviously we cannot make a horse urinate on cue" and "[w]e do draw blood at all times by procedure." N.T. at 56-57.

The Commission's expert, Dr. Mary Robinson, Veterinarian Pharmacologist and Acting Laboratory Director of PETRL, provided testimony regarding the receipt, handling, and testing of submitted samples. N.T. at 67-70. Dr. Robinson stated that Carisoprodol "acts in the brain to decrease muscle contractions" and helps with soreness and pain. N.T. at 99. Dr. Robinson agreed with Dr. Tobin that both the level of Carisoprodol, and its metabolized form, Meprobamate, were found in very low concentrations in CD and likely would not have affected the horse's performance. N.T. at 80-81, 94-95. However, Dr.

5

Robinson testified that it was impossible to know exactly how much of the drug was given to CD or when the substance was administered to the horse. N.T. at 98.

Dr. Robinson rejected Dr. Tobin's theory that the horse was exposed to the drug through inadvertent human transference. N.T. at 81. She stated that the plasma concentration generated by CD's test samples indicated that CD ingested a minimum of eight milligrams of Carisoprodol. N.T. at 81. Dr. Robinson opined that because Carisoprodol is a non-naturally occurring substance, it is "extremely unlikely that eight milligrams of [C]arisoprodol would be able to be transferred from a tablet to somebody's hands and then to the horse." N.T. at 81-82. Dr. Robinson noted that Carisoprodol tablets are formed with special binders to ensure the drug will not release during handling but will only dissolve within the gastrointestinal tract. N.T. at 82.

Dr. Robinson also testified that PETRL did not test CD's urine sample because it had already identified the presence of both Carisoprodol and Meprobamate in the plasma sample and, thus, had sufficient information to verify the drug's presence in the horse's system during the race. N.T. at 88.

Petitioner emphatically denied giving the prohibited drug to CD. N.T. at 109, 107. Petitioner testified that he was "stunned" and "heartbroken" to receive CD's positive test results of Carisoprodol. N.T. at 109. He stated that after 30 years in the horse racing industry, receiving bad test results was "one thing you don't worry about." *Id*. Petitioner testified that he implements numerous precautions to prevent something like this from happening, such as not purchasing products containing pepper, commingling medical syringes, or sharing equipment with other horses. N.T. at 107-08.

6

By July 26, 2017 order,[4] the Commission found that although both experts agreed that the small amount of Carisoprodol discovered in CD likely did not enhance the horse's performance, the only determining factor for disqualifying a horse is whether it participated in a race with a foreign substance. The Commission found that there was substantial evidence to support a finding under Section 163.303(b) of the Commission's regulations[5] that CD carried a foreign substance during the race, noting that two laboratories had confirmed the positive test result of Carisoprodol in the horse during race time. Consequently, the Commission upheld the Board's decision to disqualify CD from the purse money based upon the finding of a foreign substance pursuant to Section 163.303(c).[6]

---

[4] While unrelated to the Board's decision, Alan Pincus, Esquire, counsel for Petitioner, was administratively suspended from the practice of law by our Supreme Court's July 26, 2017 order, effective August 25, 2017. Petitioner was represented at the March 28, 2017 hearing, and a petition for review was filed on August 22, 2017, while Pincus was still an active member of the bar. Pincus has since been restored to active status and has filed an appearance in this Court. *See* In re: Attorneys Administratively Suspended Pursuant to Pa. R.C.L.E. 111(b), No. 53 INC.

[5] Section 163.303(b) states:

> A finding by the chemist that a foreign substance is present in the test sample shall be prima facie evidence that the foreign substance was administered and carried in the body of the horse while participating in a race. This finding shall also be taken as prima facie evidence that the trainer and his agents responsible for the care or custody of the horse has been negligent in the handling or care of the horse.

58 Pa. Code §163.303(b).

[6] Section 163.303(c) provides:

> A finding by the chemist of a foreign substance or an approved substance used in violation of this section and §§ 163.301, 163.302, and 163.304-163.308 in a test sample of a horse participating in a race may result in the horse being disqualified

**(Footnote continued on next page…)**

7

On appeal to this Court,[7,8] Petitioner first argues that the Commission selectively applied its own regulations to some owners/trainers and their horses, but not to others. Petitioner states that by not requiring post-race testing from the other three horses that finished in the money in the ninth race, he was unfairly penalized. Petitioner emphasizes Klouser's testimony that, although the regulation at Section 163.318 required the testing of four horses from the ninth race, it was "common practice" for the Commission to only test the winning horse, absent special circumstances. N.T. at 60. Petitioner argues that the Commission must update its regulations before adopting new practices.

---

**(continued…)**

> from purse money or other awards except for purposes of parimutuel wagering which shall be in no way affected.

58 Pa. Code §163.303(c).

[7] The Commission moves to quash this appeal citing numerous errors within Petitioner's brief and reproduced record. Relying on *Commonwealth v. Stoppie*, 486 A.2d 994, 995 (Pa. Super. 1984), the Commission states that an appellant's failure to comply with the Pennsylvania Rules of Appellate Procedure may constitute the basis for quashing an appeal. However, when a brief is defective but its mistakes do not impede our ability to conduct meaningful appellate review, we will consider the merits on appeal. *Sudduth v. Commonwealth*, 580 A.2d 929, 930 (Pa. Cmwlth. 1990). Such is the case here.

[8] Our scope of review of a Commission order is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *MEC Pennsylvania Racing v. Pennsylvania State Horse Racing Commission*, 827 A.2d 580 (Pa. Cmwlth. 2003). Substantial evidence is such relevant evidence which a reasonable mind might accept as adequate to support a finding. *York Terrace/Beverly Enterprises v. Workmen's Compensation Appeal Board (Lucas)*, 591 A.2d 762 (Pa. Cmwlth. 1991). Further, questions of evidentiary weight and resolution of evidentiary conflicts are for the Commission, not the reviewing court. *Bocachica v. Pennsylvania State Horse Racing Commission*, 843 A.2d 450 (Pa. Cmwlth. 2004).

The regulation at Section 163.318 requires the Commission to test all of the horses that win money in exotic wagering races and authorizes the Commission to subject other horses to testing. The same regulation affords owners and trainers notice that their horses, especially when they win, may be asked to submit to drug testing following a race. Petitioner has participated in horse racing for 30 years, and he does not argue on appeal that he never received notice of this regulation. Most important, there is no evidence, and Petitioner does not allege, that any failure by the Commission to test the other three horses somehow affected CD's test results or the positive findings of Carisoprodol. Accordingly, whether the Commission failed to satisfy the regulation's requirement to test four horses in the ninth race has no bearing on the disposition of Petitioner's appeal.

Petitioner also claims that the sampling methodology used was impermissible. Specifically, he first objects to the use of plasma and serum blood samples. Relying on Dr. Tobin's report, Petitioner argues that the respective results of PETRL and Texas A&M Laboratory cannot confirm one another because plasma and serum cannot be used interchangeably.[9] Petitioner has only pointed out that the drug level found in the plasma and serum tests varied (*i.e.*, PETRL's plasma sample showed 33.6 plus or minus 16.1 pg/ml of Carisoprodol; Texas

---

[9] In her testimony, Dr. Robinson stated that plasma and serum blood samples are distinguished based on the type of tube used in collecting the sample. N.T. at 85. She noted that using a tube with an anticoagulant prevents the blood from clotting, creating "plasma," whereas using a tube without an anticoagulant, allows the blood to clot, creating "serum." *Id.* She explained that both plasma and serum are considered to be the liquid portion of a blood sample, but unlike plasma, the clotting proteins have been removed from serum. N.T. at 86.

A&M Laboratory's serum sample indicated 136.3 plus or minus 27.7 pg/ml of Carisoprodol, F.F. Nos. 6, 10). However, Section 163.315 provides:

> Urine or blood test reports prepared by the official chemist of the Commission shall be deemed prima facie correct and all steps undertaken in the collection, preservation, handling and testing thereof shall be presumed correct in the absence of affirmative proof to the contrary.

58 Pa. Code §163.315.

Thus, it is Petitioner's burden to present evidence rebutting the blood test reports. Other than noting the difference in the amount of Carisoprodol found by each test, Petitioner has provided no evidence to support his assertion that using plasma and serum samples somehow altered the outcome of the test results. Petitioner does not suggest that either test was a false positive and as we will explain *supra*, the amount of a prohibited drug found in the horse is irrelevant.

Secondly, Petitioner asserts that the Commission violated Section 163.313 in testing CD's blood sample when a "primary" urine sample was available. Section 163.313 states:

> A urine sample of the winner of each race and of a horse running an unusual or abnormal race and of any other horse as the stewards on the Commission may direct shall be taken. In the event of difficulty in taking or securing a sample:
>
> (1)   A veterinarian may inject an amount up to and including 2 cc. of an approved diuretic for the purpose of enhancing the securing of a sample upon securing written consent from the trainer.
>
> (2)   If a urine sample cannot be obtained within 2 hours after a horse has been received at the detention

10

barn, a blood sample shall be secured by a veterinarian.

(3) The veterinarian in charge of the detention barn may, in his sole discretion, take a blood sample in lieu of a urine sample at any time if he believes it physiologically to be for the best interests of the horse.

58 Pa. Code §163.313.

Petitioner interprets this regulation to require testing of urine samples unless there is difficulty obtaining one or the horse exhibits physiological issues. Petitioner contends that both urine and blood samples were obtained from CD following the race, and the Commission failed to provide any justification for ignoring its own regulatory language by testing CD's blood sample. Petitioner states that in recent years, the Commission has preferred blood to urine samples, and he argues that the Commission cannot implement new practices without first updating its regulations.[10]

However, the Commission's regulations that relate to "urine" and "blood" sampling do not restrict testing to urine samples or identify urine as the "primary" sampling form. To the contrary, the usage of blood samples is clearly authorized. *See*, *e.g.*, Section 163.302, 58 Pa. Code §163.302 ("a body substance including but not limited to blood or urine taken from a horse"); Section 163.305, 58 Pa. Code §163.305 ("immediately prior to treatment, a blood sample shall be taken").

---

[10] Dr. Robinson testified that per her understanding, urine was the "primary" form of testing when the Commission's regulations were first enacted. N.T. at 88. She acknowledged that presently, blood is an easier sample to work with, and she did not believe the regulations concerning sampling had yet been updated. N.T. at 88-89.

11

Next, relying on Dr. Tobin's report, Petitioner argues that CD was not intentionally provided Carisoprodol, but that the horse tested positive for the drug most likely because of an unavoidable human transference. Dr. Tobin analogizes Carisoprodol to caffeine and notes that the ARCI's guidelines provide that the accidental human transference of caffeine will be considered as a mitigating factor in issuing a penalty. Appendix 6, Dr. Tobin's Report, Attachment 5. Dr. Tobin stated that the minuscule amount of Carisoprodol found in CD's body supports such a finding, especially considering that Carisoprodol is a drug prescribed to humans for recreational use. Dr. Tobin also opined that CD was likely exposed to Carisoprodol in the hour before the drug testing occurred, which provided significant opportunities for inadvertent human contact.

The ARCI guidelines make no exception for an inadvertent transference of Carisoprodol. Moreover, the Commission found that no prescriptions for Carisoprodol were issued to any persons associated with the horse and that the drug was administered to the horse purposefully rather than by accidental environmental transfer. The Commission implicitly rejected Dr. Tobin's report that a single sampling measurement could determine when and how CD was exposed to the drug. Further, Petitioner's argument and evidence relating to the source of the drug exposure was rejected by the Commission and the Commission's determination in this regard is not subject to our review. *Bocachica v. Pennsylvania State Horse Racing Commission*, 843 A.2d 450, 454 (Pa. Cmwlth. 2004).

Lastly, citing *Meyer v. Pennsylvania State Horse Racing Commission*, 456 A.2d 1164, 1166 (Pa. Cmwlth. 1983), Petitioner contends that the Commission abused its discretion by disqualifying CD where both experts agreed that the low

12

concentration of Carisoprodol found in the horse was not likely performance-enhancing.  In *Meyer*, the first place horse tested positive for a foreign substance.  The Commission fined the horse's trainer but did not disqualify the horse from the purse money.  The owner of the second place horse appealed to this Court, arguing that the Commission abused its discretion by not withholding the purse money and by failing to explain its decision.  Affirming, we held that the Commission's administrative rules authorized, but did not require, the disqualification of the horse.  We also noted that the Commission cited the testimony of "Dr. Thomas Tobin, Professor of Veterinary Science and Professor of Toxicology at the University of Kentucky," that the substance found in the horse would not have affected its racing ability.  *Meyer*, 456 A.2d at 1166.

Petitioner maintains that CD's disqualification in this case enforces a standard of strict liability because the Commission failed to consider whether the concentration of the drug in CD affected the horse's performance.  However, we have previously explained that the amount of a drug found in a horse is irrelevant.  *Vaders v. Pennsylvania State Horse Racing Commission*, 964 A.2d 56, 59 (Pa. Cmwlth. 2009).  In *Vaders*, we held that the Commission did not violate a trainer's due process rights when it denied his discovery requests.  *Id*. at 56.  In so holding, we explained:

> [The petitioner's] burden was to rebut the presumptions created under Sections 163.303(b) and 163.315 of the Commission's regulations which provide, *inter alia*, that a positive finding is prima facie evidence that a foreign substance was in the horse while it participated in a race.  Knowing the concentration levels that were present in [the horse] would not help [him] rebut the presumption that there was a foreign substance in [his] horse on race day.

13

\* \* \*

[The petitioner] made no attempt to introduce evidence or testimony that [he] did not violate the Commission's regulations; nor did [he] ever deny that there were banned substances found in [his] horse.

*Id*. at 59, 60.

In sum, none of Petitioner's arguments counter the Commission's determination that CD tested positive for a substance prohibited by the Commission on race day. Contrary to Petitioner's assertions, he fails to explain how the testing of only CD in the ninth race, the use of blood instead of urine sampling, or the distinction between plasma and serum, affects the finding that a foreign substance was found in the horse on race day, in violation of Section 163.318.

Accordingly, we affirm the Commission's order.

_____
MICHAEL H. WOJCIK, Judge

14

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Martin Ciresa,                        :
                                      :
                    Petitioner        :
                                      :
         v.                           : No. 1155 C.D. 2017
                                      :
                                      :
Pennsylvania State Horse              :
Racing Commission,                    :
                                      :
                    Respondent        :

# O R D E R

AND NOW, this 17th day of January, 2019, the order of the Pennsylvania State Horse Racing Commission, dated July 26, 2017, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge