PHILADELPHIA COUNTY MEDICAL SOCIETY, Raymond J. Lodise, M.D., Pennsylvania Society Of Internal Medicine, and Robert B. Sklaroff, M.D., Petitioners,

v.

Linda S. KAISER, Commissioner, Insurance Department of Pennsylvania, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 4, 1997.

Decided Aug. 12, 1997.

---

Sara M. Staman, Philadelphia, for petitioners.

Deena Jo Schneider, Philadelphia, for respondent.

Jack M. Stover, Harrisburg, for intervenor, Highmark, Inc.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and FLAHERTY, JJ.

PELLEGRINI, Judge.

The Pennsylvania Society of Internal Medicine and Robert B. Sklaroff, M.D. (Opponents) petition for review of the November 26, 1996 decision and order of Linda S. Kaiser (Commissioner), Commissioner of the Insurance Department of The Commonwealth of Pennsylvania (Department). That decision and order approved the change in control of six subsidiaries of Blue Cross of Western Pennsylvania (Western Blue Cross) and Pennsylvania Blue Shield (Blue Shield), and approved the proposed bylaws of Highmark, Inc., the consolidated entity and corporate successor of the former Western Blue Cross and former Blue Shield. Opponents are the Philadelphia County Medical Society, the Pennsylvania Society of Internal Medicine, Robert B. Sklaroff, M.D., a corporate member of the former Pennsylvania Blue Shield, and Raymond J. Lodise, M.D., also a corporate member of the former Pennsylvania Blue Shield.

## I.

### A.

Western Blue Cross and Blue Shield were each organized under the Pennsylvania Nonprofit Corporations Law (Nonprofit Law).[1] Western Blue Cross provided hospital care coverage to subscribers in 29 counties throughout Western Pennsylvania, under that part of the Health Plan Corporations Act commonly known as the Hospital Act.[2] Blue Shield provided physician care coverage to subscribers throughout the state, under that part of the Health Plan Corporations Act commonly known as the Health Service Plan Act.[3]

Western Blue Cross and Blue Shield decided to merge their organizations and operations into a single corporate entity to be called Highmark, Inc. (Highmark). The stated purpose of the consolidation was to offer health care insurance, especially managed care, and integrated products, as a single corporate entity, as well as to operate more efficiently so as to better serve their subscribers. To effectuate the consolidation, Western Blue Cross and Blue Shield (collectively, Consolidating Companies) submitted their consolidation plan to the Commissioner for approval.[4] By that plan, the Consolidat-

---

1. Act of November 15, 1972, P.L. 1063, *as amended*, 15 Pa.C.S. §§ 5101—5998.

2. Act of November 15, 1972, P.L. 1063, *as amended*, 40 Pa.C.S. §§ 6101—6127.

3. Act of November 15, 1972, P.L. 1063, *as amended*, 40 Pa.C.S. §§ 6301—6335.

4. The Consolidating Companies requested an exemption from the filing requirements of what is commonly known as the Insurance Holding Companies Act, Act of May 17, 1921, P.L. 682, *as amended*, 40 P.S. §§ 991.1401—991.1413. Section 1402(a) of that Act, 40 P.S. § 991.1402(a), provides that, upon acquisition of control or merger with another insurer, the acquiring party must submit documents to the Department containing certain factual information regarding the parties to be merged, financial information, plans or proposals regarding the consolidation, etc. Detailed requirements pertaining to these

ing Companies proposed to consolidate to form Highmark and submitted the proposed bylaws for the new corporation to the Department.[5] Under the consolidation,[6] Highmark would operate both a hospital plan and a professional health service plan.[7]

## B.

To consolidate, Western Blue Cross and Blue Shield were required to receive the Department's approval under the Insurance Holding Companies Act and the Health Plan Corporations Act. Because the consolidation involved the change in control of the insurance company subsidiaries, Section 1402(a)(1) of the Insurance Holding Companies Act, 40 P.S. 991.1402(a)(1), required that any proposed merger or other acquisition or control of an insurance company must first be approved by the Department. Western Blue Cross and Blue Shield would not be covered under Section 1401, which specifically excludes "[n]onprofit medical and hospital service associations" from the definition of "[i]nsurer". Under Section 1402(a), the Commissioner has the authority to review the statements filed with it by the person or entity with whom the domestic insurer is to merge or be controlled by. Under Section 1402(f)(1), the Commissioner must approve a change in control unless she finds:

(i) that the insurers will not be able to satisfy the requirements for the issuance of a license to operate the line or lines of business for which they are presently licensed;

(ii) that the change in control will substantially lessen competition in health care insurance in the Commonwealth or create a monopoly therein;

(iii) that the financial condition of the acquiring party may jeopardize the financial stability of the insurer or prejudice the interests of its policyholders;

(iv) that any plans to liquidate the insurers, sells their assets, or consolidate or merge them with any person or to make material changes in their business or corporate structure or management are unfair and unreasonable to policyholders and not in the public interest;

(v) that the competence, experience and integrity of those persons who would control the operation of the insurers are such that it would not be in the interest of policyholders of the insurer and not in the public interest;

(vi) or that the acquisition is likely to be hazardous or prejudicial to the insurance buying public.

Highmark's proposed bylaws, submitted by the Consolidating Companies, Section 6328 of the Health Plan Corporations Act, 40 Pa.C.S. § 6328, also needed to obtain approval. Section 6328 provides that the bylaws of every nonprofit corporation must provide appropriate procedures for the nomination and election or appointment of the directors, and election or appointment of committees of the board so that the interests of the subscribers of the corporation will be represented in a

---

filings are set forth by 31 Pa.Code §§ 25.1—25.23. That request was denied.

5.  Western Blue Cross and Blue Shield also submitted the proposed plan of consolidation and bylaws to the Department of Health.

6.  After consolidation, Highmark would hold partial ownership of Keystone Health Plan East, Inc., and Keystone Health Plan Central, Inc., and hold complete ownership of Keystone Health Plan West, Inc., and HealthGuard of Lancaster, Inc., both of which were owned by either Western Blue Cross or Blue Shield (or both) prior to consolidation. Highmark also was to acquire complete ownership of Trans–General Casualty Insurance Company, Inc., and United Concordia Life and Health Insurance Company.

7.  Section 6101 of the Health Plan Corporations Act, 40 Pa.C.S. § 6101, defines a "[h]ospital plan

corporation" as "[a] corporation not-for-profit engaged in the business of maintaining and operating a nonprofit hospital plan." That section defines a "[n]onprofit hospital plan" as "a plan whereby for prepayment, periodical or lump sum payment hospitalization of related health benefits may be provided to subscribers to such plan." 40 Pa.C.S. § 6101.

Section 6302 of the Health Plan Corporations Act, 40 Pa.C.S. § 6302, defines a "[p]rofessional health service corporation" as "[a] dental service corporation, a general medical service corporation, or an optometric service corporation," and defines a "[g]eneral medical service corporation" as a "corporation not-for-profit engaged in the business of maintaining and operating a nonprofit professional health service plan." 40 Pa.C.S. § 6302.

just and reasonable manner. Section 6328(b)(6) gives the Commissioner, after a hearing, the authority to determine whether the bylaws of a corporation operating a professional health service plan have met these requirements as to the size and composition of its board of directors, as well as representation of subscribers. That section states:

> In the event that the Insurance Commissioner or the Secretary of Health find, after notice to the corporation and hearing, that a general medical service corporation has not met the requirements of this section, the commissioner or secretary shall notify the corporation of the findings and order the corporation, in specific terms, to meet the requirements of this section. *Such findings and order shall be subject to judicial review in the manner and within the time provided by law.* (Emphasis added).

40 Pa.C.S. § 6328(b)(6).

## C.

The Department convened a "public informational hearing" which it was not required to hold, and was pursuant to Section 1402(f)(2) [8] of the Insurance Holding Companies Act, as part of the Department's review of the filings received under that section. A notice was published in the *Pennsylvania Bulletin* that a "public informational hearing" would be held on April 26, 1996, where representatives of the Consolidating Companies would speak as to the proposed plan of consolidation. Also, interested persons were invited to attend that hearing and to submit written comments within 30 days after the hearing.

Prior to the hearing, the Department received comments from 25 individuals and organizations in support of the proposed consolidation, and from eight individuals and organizations in opposition to the proposed consolidation. Those opposing the consolidation made comments as to the statutory basis for the consolidation itself, and whether any statutory basis existed for the operation of both a hospital plan and a health services plan by a single entity. Also raised were concerns about the consolidations' affect on the social mission of the Consolidating Companies, as well as its anti-competitive effect on the health care industry throughout the state. Among those comments in opposition were seven separate comments from Opponent Robert B. Sklaroff, M.D.

At the April 26, 1996 public informational hearing, representatives of the Consolidating Companies spoke regarding the proposed consolidation and resulting changes in control of the six affected subsidiaries. No one else was permitted to present statements or ask questions. The record was held open for 30 days, during which interested persons had the opportunity to submit additional comments regarding the proposed consolidation. During that period, the Department again received comments in opposition to the consolidation from Dr. Sklaroff.

## D.

After the comment period was closed, the Commissioner approved the change in control of the subsidiaries as required under Section 1402(a) of the Insurance Holding Companies Act.[9] She also approved the by-

---

**8.** Under Section 1402(f)(2) of the Insurance Holding Companies Act, 40 P.S. § 991.1402(f)(2), if no party to a proceeding has requested a hearing, the Insurance Commissioner may convene one at her discretion. 40 P.S. § 991.1402(f)(2) provides in relevant part:

> If the merger or other acquisition of control is approved, the department shall so notify the person filing the statement and the insurer whose stock is proposed to be acquired, and such a determination is hereafter referred to as an approving determination ... The Department shall hold a hearing before making the determination required by this subsection if, within ten (10) days following the filing with the department of the statement, written re-

quests for the holding of such hearing is made either by the person proposing to make the acquisition, by the insurer whose stock is proposed to be acquired or, if such issuer is not an insurer, by the insurance company controlled by such issuer. *Otherwise, the department shall determine in its discretion whether such a hearing shall be held...* (Emphasis added).

**9.** The approval was issued subject to the condition that Highmark, among other things, would agree to make professional health services available to all Pennsylvania subscribers regardless of their income level; that it would continue the outreach and educational programs that had been conducted by the Consolidating Companies

laws of Highmark, as required by Section 6328 of the Health Plan Corporations Act. In making that determination, she found that pursuant to Section 1402 of the Insurance Holding Companies Act, 40 P.S. § 991.1402, she had the authority to approve or disapprove the change in control of affected subsidiaries previously owned by Western Blue Cross and Blue Shield and proposed to be owned by Highmark. However, because she found that Section 201 of the GAA Amendments,[10] 15 P.S. § 21201, specifically excluded health plan corporations from the definition of "insurance corporation", she held that review of consolidations and other fundamental corporate changes of health plan corporations was not included in the authority granted to her by the GAA Amendments, 15 P.S. §§ 21201–21207.

Finally, because she found that the consolidation of Blue Shield and Western Blue Cross constituted a fundamental corporate change permitted by Chapter 59 of the Nonprofit Law, 15 Pa.C.S. §§ 5921–5929, and because under Section 5929(a) of the Nonprofit Law, 15 Pa.C.S. § 5929(a), two or more corporations have the power to consolidate and form a new corporation, she concluded that she had no jurisdiction over the consolidation [11] as it was controlled by the Nonprofit Law.

Despite concluding that she lacked jurisdiction over the proposed consolidation of Western Blue Cross and Blue Shield because

that consolidation was solely controlled by the Nonprofit Law, a statute over which she had no jurisdiction, the Commissioner then found that under the Section 1402(f)(1)(v) of the Insurance Holding Companies Act, 40 P.S. § 991.1402(f)(1)(v), she had the authority to disapprove a filing by the Consolidating Companies for change in control. She would disapprove the filing if the integrity of the management of the acquiring company is such that the change in control would not be in the best interests of the policyholders and the public. Based on her finding that the Members of the Boards of each Western Blue Cross and Blue Shield had voted to consolidate, and that they felt consolidation was in the best interests of the Members, with which she agreed, she concluded that the standard for integrity of Highmark was satisfied by that vote.

Addressing other concerns raised by the comments of the Opponents to consolidation, the Commissioner found:

● that the procedures outlined in Highmark's proposed bylaws for nominating, electing and appointing its directors, as well as the proposed proportionate representation of professionals and subscribers (by which the Board of Directors will be composed of 75% lay members and 25% health care professionals) complied with the Health Plan Corporations Act because that fell within the terms of that Act's requirements for size and composition of the Board.

---

for a period of three years; that it would offer coverage continuity programs to individuals; that it would continue to participate in programs such as Special Care, the Caring Program for Children, and the Children's Health Insurance Program (CHIP) for four years, while those programs were in existence. Highmark also agreed that for three years, it would not refuse to administer an employee welfare benefit plan for a self-insured employer on the grounds that the employer also offered employees a competing plan, nor restrict physicians with whom it contracted (other than its own employees) from providing services outside its network or from participating in other networks, unless other payers established exclusive provider arrangements or the delivery of services outside Highmark's system would impair or interfere with safe and effective treatment of a patient.

**10.** Act of December 19, 1990, P.L. 834, §§ 101–404, 15 P.S. §§ 21101—21404. The GAA

Amendments are amendments to the General Association Act of 1988, Act of December 21, 1988, P.L. 1444, §§ 101–304, 15 P.S. § 20101—20304.

**11.** The Commissioner found that under Section 5923 of the Nonprofit Law, 15 Pa.C.S. § 5923, each member of a nonprofit corporation entitled to vote must be given notice of a proposed plan, such as the proposed plan of consolidation. Section 5924 of the Nonprofit Law, 15 Pa.C.S. § 5924, provides that where the majority of the votes of those members present is in favor of the proposed plan of consolidation, that plan shall be adopted. Because a majority of the members of both Western Blue Cross and Blue Shield, respectively, approved the proposed plan, the Commissioner determined that those votes satisfied the requirements of the Nonprofit Law, as well as the Insurance Holding Companies Act.

● that Highmark would be subject to the requirements of both the Hospital Plan Act and the Health Service Plan Act because it proposed to operate both a health service plan and a hospital plan.

● that the existing certificates of authority of each Western Blue Cross and Blue Shield, as property rights, passed to Highmark by operation of law,[12] so that no new certificate of authority was required.

● that the competitive standards contained in the Insurance Holding Companies Act were not applicable to the consolidation, and, even if they were, that the proposed consolidation complied with those standards.[13]

● that the proposed consolidation would still fulfill the charitable and benevolent purposes of the Consolidating Companies, because Highmark, as the successor corporation, would still be bound by the same statutory requirements of the Health Plan Corporations Act as Western Blue Cross and Blue Shield, mandating that nonprofit corporations operating hospital and professional health service plans be charitable and benevolent institutions, and maintain open enrollment.

She also approved the proposed bylaws of Highmark under Section 6328 of the Health Plan Corporations Act, because those bylaws complied with the Law's specific requirements for the composition of the board of directors, as well as the procedures for the nomination, election and appointment of directors.

## II.

■ All the parties, in some form or another, contend that this case is not ready for or subject to judicial review.[14] Opponents contend that the matter is not ready for appellate review because the record below is inadequate because there is no formal record for us to review. Highmark also agrees that

| Insurer A | Insurer B |
|-----------|-----------|
| 5% | 5% or more |
| 10% | 4% or more |
| 15% | 3% or more |
| 19% | 1% or more |

A highly concentrated market is one in which the share of the four largest insurers is seventy-five per centum (75%) or more of the market. Percentages not shown in the tables are interpolated proportionately to the percentages that are shown. If more than two insurers are involved, exceeding the total of the two columns in the table is prima facie evidence of violation of the competitive standard in paragraph 91. For the purpose of this subparagraph, the insurer with the largest share of the market shall be deemed to be insurer A.

---

12. Section 5929(b) of the Nonprofit Law, 15 Pa. C.S. § 5929(b).

13. The Insurance Holding Companies Act specifically excludes "[n]onprofit medical and hospital service associations", including health maintenance organizations (HMO's), from the definition of "[i]nsurer", 40 P.S. § 991.1401, so that the competitive standard of Section 1403 does not apply to the consolidation of Western Blue Cross and Blue Shield. But, even applying the statutory standards applicable to a highly concentrated market to the six subsidiaries that are subject to Section 1403 as "insurers", the Commissioner determined that the change in control of those entities would not violate the competitive standard of Section 1403(d).

Section 1403(d)(2)(i) sets forth part of the criteria which should be considered by the Department in determining whether a proposed consolidation would violate the competitive standard of that section, and indicates that any acquisition by two or more insurers competing in the same market is prima facie evidence of violation of the competitive standards as follows:

(A) if the market is highly concentrated and the involved insurers possess the following shares of the market:

| Insurer A | Insurer B |
|-----------|-----------|
| 4% | 4% or more |
| 10% | 2% or more |
| 15% | 1% or more |

(B) if the market is not highly concentrated and the involved insurers possess the following shares of the market:

14. The application for stay was denied for want of compliance with Pa. R.A.P. No. 1781(a). Highmark filed a petition to intervene on December 6, 1996. On December 11, 1996, Petitioners filed an application for an injunction pending appellate review, which was denied by order dated March 27, 1997. And, on December 24, 1996, the Commissioner filed an application to quash the petition for review for lack of standing, which was denied.

Our scope of review of a decision of the Insurance Commissioner is limited to a determination of whether constitutional rights have been violated, an error of law was committed, or the findings of fact were not supported by substantial evidence. *Iwanejko v. Insurance Commissioner*, 664 A.2d 1069 (Pa.Cmwlth.1995).

the appeal is not ready for appellate review because Opponents were required to exhaust their internal appeals within the agency before appealing to this court. For her part, the Commissioner contends that there is nothing to appeal because her determination to allow the consolidation is not appealable because it is not an adjudication, but a determination, from which no party can appeal, not even Highmark, had she denied its request.

■ To determine whether it is ready for judicial review, we must first determine whether the Commissioner's order is an "adjudication." If the agency action is not an "adjudication", then it is not subject to judicial review by way of appeal. *Baker v. Human Relations Commission,* 507 Pa. 325, 489 A.2d 1354 (1985). 42 Pa.C.S. § 702.

Section 101 of the Administrative Agency Law defines an "adjudication" as:

> Any *final* order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties[15] to the proceeding in which the adjudication is made. (Emphasis added).

■ Because, by definition, an agency action only results in an adjudication when there is a final order, *see Stone and Edwards Insurance, Inc. v. Department of Insurance,* 161 Pa.Cmwlth. 177, 636 A.2d 293 (1994), *affirmed and remanded,* 538 Pa. 276, 648 A.2d 304 (1994), only when those administrative appeals have been exhausted will the agency action become an adjudication subject to judicial review. *See Killian v. Unemployment Compensation Board of Review,* 46 Pa.Cmwlth. 219, 405 A.2d 1372 (1979); *Allegheny Ludlum Steel Corp. v. Public Utility Commission,* 501 Pa. 71, 459 A.2d 1218 (1983). Of course, if a party does not timely seek to have a hearing from an adverse agency adjudication, the adjudication becomes final and unappealable. *Martin v. Commonwealth, Department of Environmental Resources,* 120 Pa.Cmwlth. 263, 548 A.2d 672 (1988), citing, *Commonwealth v. Derry Township,* 466 Pa. 31, 351 A.2d 606 (1976).[16]

■ Even though the agency action has a direct impact on the person's rights or privileges, and is final so as to fall within the definition of an "adjudication", the action is not "valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa.C.S. § 504. Until a hearing is held before the administrative agency and a record of that hearing made, Section 504 of the Administrative Agency Law provides that the adjudication is not valid or effective. *Turner v. Public Utility Commission,* 683 A.2d 942, 946 (Pa.Cmwlth.1996). The reason behind this requirement is that judicial review, absent a valid administrative adjudication or proper record, is a "premature interruption of the administrative process." *Id.,* citing, *Canonsburg General Hospital v. Department of Health,* 492 Pa. 68, 422 A.2d 141 (1980). Moreover, until a hearing, and, if necessary, the taking of evidence where facts are disputed, the issues cannot be properly clarified, whether there is a direct interest of the party taking the appeal and questions of fact sufficiently resolved to create a record upon which judicial review can be conducted.[17]

---

**15.** Section 101 of the Administrative Agency Law defines a "party" as:

> Any person who appears in a proceeding before an agency who has a direct interest in the subject matter of such proceeding.
> 2 Pa.C.S. § 101.

**16.** Pursuant to Section 5103(a) of the Judicial Code, 42 Pa.C.S. § 5103(a), under certain circumstances, Opponents' appeal, if erroneously filed with this court, may be transferred to the proper tribunal. Section 5103(a) states:

> A matter which is within the exclusive jurisdiction of a court or district justice of this Commonwealth but which is commenced in any other tribunal of this Commonwealth shall be transferred by the other tribunal to the proper court or magisterial district of this Commonwealth where it shall be treated as if originally filed in the transferee court or magisterial district of this Commonwealth on the date when first filed in the other tribunal.
> 42 Pa.C.S. § 5103(a).

**17.** Where no factual issues are in dispute, no evidentiary hearing is required under Section 504 of the Administrative Agency Law, *United Healthcare Benefits Trust v. Insurance Commissioner of Pennsylvania,* 152 Pa.Cmwlth. 549, 620 A.2d 81 (1993). Here, however, the Department has not yet determined whether there exist factu-

■ Opponents contend that they have a "direct interest" in the Commissioner's decision to allow consolidation, making them a "party" to the proceeding below, yet they have sought to directly appeal to this court an "adjudication", and, even if so, that it is not yet valid as to them and unappealable before us. Consequently, we will transfer this case back to the Department to consider whether Opponents' interests are sufficiently direct so as to be a "party" and, if so, conduct sufficient hearings to resolve any factual disputes. Because in the absence of a hearing before the Department, no "final order" of the Department is before us, Opponents' judicial review is premature and we will transfer the case to the Department for such a hearing. *See Norwood A. McDaniel Agency v. Foster,* 117 Pa.Cmwlth. 227, 543 A.2d 155 (1988).

Accordingly, Opponents' appeal is transferred to the Department for a hearing pursuant to Section 504 of the Administrative Agency Law, 2 Pa.C.S. § 504.

### ORDER

AND NOW, this 12th day of August, 1997, the appeal of Opponents is transferred to the Insurance Department for a hearing pursuant to Section 504 of the Administrative Agency Law, 2 Pa.C.S. § 504. Jurisdiction relinquished.

LEADBETTER, J., did not participate in the decision of this case.

al issues or mixed issues of law and fact, so that an evidentiary hearing may have been required.

If the Department had found that factual issues exist, an adjudicatory action cannot be subject to valid judicial review by any tribunal, either judicial or administrative, except upon a hearing wherein each party has the opportunity to know the claims of his opponents, hear and present evidence, cross examine witnesses, and to present argument. *Callahan v. Pennsylvania State Police,* 494 Pa. 461, 431 A.2d 946 (1981). Because here, all that was provided was a "public informational hearing" at which Opponents were neither permitted to cross examine witnesses nor present evidence on their own behalf, the Department did not determine whether an evidentiary hearing was required, and that requirement of the Administrative Agency Law were not complied with. An agency's adjudication is invalid where it "failed to comply with the statutory requirements of notice of a hearing and an opportunity to be heard." *Id.,* 494 Pa. at 465, 431 A.2d at 948.