Gary L. JOHNSTON, individually; Robert Dale Rearick, individually; Michael P. Cumberledge, individually; Bobbi Cumberledge, individually; Jack R. Cumberledge, individually; David Cornish, individually; Merle Dunbar, individually; Earl Wissinger, individually; Vicki L. McGaughey, individually; Donald Earl Miller, individually; Doris Jean Gearhart, individually, Appellants

v.

The TOWNSHIP OF PLUMCREEK, Armstrong County, Pennsylvania; The Township of Kittanning, Armstrong County, Pennsylvania; Kittanning–Plumcreek Water Authority.

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 21, 2004.

Decided Sept. 28, 2004.

William C. Kerr, III, Brookville, for appellants.

Michael J. Supinka, Indiana, for appellees.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and MIRARCHI, Senior Judge.

OPINION BY Judge LEAVITT.

Gary L. Johnston, *et al.*, are residents of Armstrong County (Residents) who have appealed an order of the Court of Common Pleas of Armstrong County (trial court) dismissing their complaint. Residents' complaint challenged the constitutionality of Township ordinances requiring them to connect to the public water system. The trial court sustained the preliminary objections of Kittanning–Plumcreek Water Authority (Water Authority), Kittanning Township, Plumcreek Township (collectively Townships) and Armstrong County, holding that Residents failed to state a cause of action in their complaint.

Residents' action had its origins in two identical ordinances (Ordinances) that were adopted by the Townships in early 2000. Each stated, in relevant part, as follows:

(Section 1) Every owner of property in the Township of Kittanning whose property abuts upon any public water line presently in existence or to be constructed in the future by the Kittanning Plumcreek Water Authority shall connect with the aforementioned water line, at their own cost, each house, building, or other occupied structure located on said property, which at its nearest point is located within 150 feet of the said public water line, for the purpose of providing water for human consumption to said property.

(Section 2) It shall be unlawful for any owner, lessee or occupier of any house, building or other occupied structure located on property in the Township which abuts upon any public water line, which said house, building or other occupied structure is located at its nearest point within 150 feet of the said public water, line to employ any means, either by

spring, well, cistern system, or otherwise, other than the public water line for the supply of water.

Kittanning Township, Pennsylvania, Ordinance No. 214–2000 (February 14, 2000).[1] To ensure compliance, the Ordinances provide for criminal sanctions, including fines of up to $600, and imprisonment of up to thirty (30) days.

In response to these enactments, Residents filed the complaint *sub judice.* They asserted that as a result of the terrorist attacks on September 11, 2001, and the nation's war on terrorism, there is now a real and present danger of terrorist attacks on public water systems. Residents alleged that the Water Authority is not in a position to protect its customers, including Residents, from having their water poisoned by chemical or biological contaminants. Further, Residents have safe on-site water sources from wells, springs and cisterns to which the Ordinances improperly deny them access. Residents based their request for declaratory and injunctive relief on two legal theories. In their first count, Residents asserted a claim pursuant to Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, that their substantive due process rights guaranteed by the 14th Amendment to the U.S. Constitution had been violated by the Ordinances. In their second count, the Residents asserted that their right to life guaranteed by Article I, Section 1 of the Pennsylvania Constitution had been abridged by the Ordinances.

Armstrong County, the Water Authority and the Townships filed preliminary objections to the complaint. They moved to strike or have amended certain allegations in the complaint that were "vague" and "scandalous," particularly those that chal-

1. This language also appears in Ordinance No. 13 adopted by Plumcreek Township on March 6, 2000, except that Section 1 refers to "Township of Plumcreek."

lenged the Water Authority's ability to provide a safe water supply. They also filed a demurrer seeking dismissal of the entire complaint for failure to state a cause of action. The trial court sustained the demurrer and dismissed the complaint. This appeal ensued.

Before this Court, Residents raise three questions for our consideration.[2] First, they assert that the trial court erred in failing to recognize the right of every individual to "provide for his protection from life threatening incidents." Residents' Brief at 5. Second, they claim that the trial court erred in failing to enforce the constitutional right of every individual "to refuse to use and consume water provided by a Municipal Water Authority."[3] *Id.* Third, they assert that the trial court erred because the complaint's allegations of threat to life were sufficiently detailed to state a constitutional claim redressable under Section 1983 of the Civil Rights Act. Residents' three issues raise a single question: whether the Ordinances are constitutionally infirm.

██ The burden of proving any ordinance unconstitutional is a heavy one inasmuch as the ordinance enjoys a strong presumption of validity. *Schubach v. Silver*, 461 Pa. 366, 336 A.2d 328 (1975).[4] The trial court held that Residents could not meet this heavy burden. In so holding, the trial court relied upon this Court's specific holding that an ordinance mandating connection to a public water system and disconnection from other sources was not an unconstitutional regulatory taking. *Citizens for Personal Water Rights v. Borough of Hughesville*, 815 A.2d 15 (Pa. Cmwlth.2002). Residents do not assert a regulatory taking but, rather, a "state-created danger" as the basis of their Section 1983 claim.[5] However, the trial court held that Residents' complaint fell short of the mark because it did not allege a direct, real or immediate threat of harm; the harm alleged by Residents was conjectural and shared by all Americans who are connected to a public water system. This lack of specificity, the trial court held, was also fatal to Residents' claim under Article I, Section 1 of the Pennsylvania Constitution.[6]

██ We consider, first, the standard by which to judge the constitutionality of the Ordinances. Residents claim that the Ordinances should be tested under the

---

2. In an appeal of a trial court's decision to dismiss a complaint, our scope of review is limited to determining whether the trial court committed an error of law or abused its discretion. *Miller v. Kistler*, 135 Pa.Cmwlth. 647, 582 A.2d 416 (1990). In a demurrer, the court must accept as true all well-pled facts in the complaint, as well as all inferences reasonably deducible therefrom. *Cohen v. City of Philadelphia*, 806 A.2d 905, 912 (Pa. Cmwlth.2002). However, the court is not constrained to accept as true either unwarranted factual inferences or legal conclusions asserted in the pleading. *Id.*

3. Essentially, Residents' first two questions can be addressed by the same constitutional analysis. The right to refuse to use public water is subsumed into the asserted right to protect one's life.

4. If the ordinance's constitutionality is debatable, legislative judgment controls. *Bilbar Construction Co. v. Easttown Township Board of Adjustment*, 393 Pa. 62, 141 A.2d 851 (1958).

5. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

6. In their appeal to this Court, Residents do not dispute, with any specificity, the trial court's analysis. Instead, they simply repeat the same arguments made to the trial court to support their contention that the threat of terrorist attack renders the Ordinances constitutionally infirm because they interfere with Residents' right to life.

strict scrutiny test because the "right to protect one's own life" is a fundamental right protected by the 14th amendment to the U.S. Constitution[7] and by Article I, Section 1 of the Pennsylvania Constitution.[8] A statute that intrudes upon a citizen's fundamental right is subject to strict scrutiny. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Stenger v. Lehigh Valley Hospital Center,* 530 Pa. 426, 609 A.2d 796 (1992). Residents argue that because the Ordinances intrude upon their fundamental right to privacy, the Ordinances must be reviewed under a strict scrutiny analysis. We disagree.

Residents can cite no direct precedent to support their proposition that the right to privacy includes the right to refuse to connect to a public water supply.[9] They attempt to find this support by extending the meaning of precedent beyond the bounds intended by the courts. For example, Residents refer our attention to *Washington v. Harper,* 494 U.S. 210, 229, 110 S.Ct.

1028, 108 L.Ed.2d 178 (1990), in which the United States Supreme Court noted that "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." Residents believe that they also have a right "to make important decisions about what substances are to enter their bodies." Residents' Brief at 19. Thus, they contend that their right to privacy, *i.e.,* to refuse public water, is a fundamental right that should be recognized drawing on *Griswold* and *Washington.*[10]

Residents' argument rests on the false premise that the Ordinances force the ingestion of water from an "unknown" source. The Ordinances only require Residents to hook up to the Water Authority's system. They can use this water or not. Residents are free to ingest the water drawn from wells and springs in Pennsylvania, other states and even other continents. Such water, in bottled form and of "known" provenance, is widely available.

---

**7.** It states in relevant part:

    **Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

**8.** It states in relevant part:

    All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. art I, § 1.

**9.** Indeed, to the extent authority exists, it is contrary. In *Stern v. Halligan,* 158 F.3d 729,

731 (3d Cir.1998), the Court of Appeals for the Third Circuit held that an ordinance mandating residents to hook up to a public water supply and to discontinue using their well water did *not* implicate the residents' constitutional right to privacy.

**10.** Residents also analogize to the right to privacy recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1993). They note that the right of privacy allows a woman "to choose to end the life of an unborn fetus." Residents' Brief at 19. They argue that it is at least as logical to recognize that the right of privacy allows an "individual to choose whether or not he will ingest a liquid that he is unsure of the source so as to protect his life." *Id.* The problem with this argument is that the Ordinances do not force anyone to ingest the water available from the Water Authority.

In sum, we disagree that the Ordinances should be evaluated under the strict scrutiny test. Residents will be required to hook up to the Authority's water system and denied access to existing wells, but they will not be forced to drink it. There is no recognized fundamental right to use water from a particular source, and we decline to create one.

The appropriate standard for considering the constitutionality of the Ordinances is the minimum rationality standard. In *Borough of Hughesville*,[11] we found the holding of the Court of Appeals for the Third Circuit in *Stern* to be "instructive, persuasive, and directly applicable." 815 A.2d at 22. In *Stern*, the Court of Appeals described the burden of plaintiffs, who challenged a mandatory water connection ordinance on substantive due process grounds, as follows:

> The plaintiffs contend that [the] Ordinance ... which requires residents to hook up to the public water supply when it becomes available and to discontinue the use of well water in the home, violates the United States Constitution because their well water is "safe and pure." ...
>
> [W]hen "general economic and social welfare legislation" is alleged to violate substantive due process, it should be struck down only when it fails to meet a minimum rationality standard, an "extremely difficult" standard for a plaintiff to meet. The only question is "whether the law at issue bears any rational relationship to any interest that the state legitimately may promote," simple unfairness will not suffice to invalidate a law. The challenger bears the burden of proving irrationality.

*Stern*, 158 F.3d at 731, *quoted in Borough of Hughesville*, 815 A.2d at 21 (emphasis added) (quotations omitted).

In accordance with the precedent in *Borough of Hughesville* and *Stern*, we consider whether Residents can meet the "extremely difficult" standard of proving the Ordinances irrational. Residents argue that their right to life, a right recognized since the Magna Carta,[12] gives them the right to preserve their lives by refusing water from a source "under threat of poisoning, pollution or disruption by terrorist activity." Residents' Brief at 8. The trial court understood Residents' challenge to be one that fell under the "state-created danger" theory to Section 1983 civil rights claims. *See Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996); *Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239 (Pa.Cmwlth.2002). We agree with the trial court that this body of jurisprudence does not fit in this case.

First, the state-created danger has been used to make states liable in damages

---

**11.** As noted above, *Borough of Hughesville* considered whether a mandatory hook-up ordinance violated substantive due process as a regulatory taking; we upheld the ordinance.

**12.** Residents argue that the Magna Carta affirms the natural law right of free men to life, liberty, and property, which includes the right of man to protect his own life. As our Supreme Court has noted,

> The principle of the unalienable right of private property is centuries old and underlies several articles of Magna Carta. The right of private property, together with the right of freedom of speech, freedom of religion, and freedom of the press are the hallmarks of western civilization ... [However, a]s this Court said in *Lord Appeal*, 368 Pa. 121, 130, 81 A.2d 533, 537 (1951) quoting from *White's Appeal*, 287 Pa. 259, 134 A. 409 [(1926)], "all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety, or morals [or general welfare] of the people."

*Appeal of Key Realty Co.*, 408 Pa. 98, 109–110, 182 A.2d 187, 193 (1962) (Bell, C.J., concurring).

where the state, by affirmative exercise of its power, has rendered an individual unable to care for himself. The leading case in this area of law is *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), in which the Supreme Court held that a county agency could not be held liable in damages where a child suffered abuse while in his father's custody. The Court reasoned that the Due Process Clause does not guarantee minimal safety for citizens but, rather, protects citizens from overreaching by the state. *DeShaney* placed limits upon what is known as the "state-created danger" theory for creating Section 1983 civil rights liability in damages to the situation where the state has limited the liberty of the citizen to act in his own behalf.[13] However, as far as can be determined, the "stated-created danger" body of jurisprudence has never been used to nullify a statute or ordinance.

Second, even if the "state-created danger" theory could be used to render a statute unconstitutional, it does not fit the facts of this complaint. In *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir.1998), the Court of Appeals held that the state could not be held liable for a "risk that affects the public at large."[14] The state has to be aware that its actions *specifically* endanger an individual in order to be held liable. *Kneipp*. All government activities involve some risk; for example, motorists are killed each year on state highways. The mere construction of a highway, however, does not give rise to civil rights liability to each of those accident victims in part because the risk is general and not specific to an individual. Here, the trial court correctly observed that the harm alleged by Residents was conjectural, not imminent and real.[15]

■ The Ordinances do not violate Residents' substantive due process rights under the state-created danger theory.[16] Under *Deshaney*, the Townships do not have an obligation to guarantee that terrorists, who are private actors whether homegrown or international, will not contaminate the Water Authority's system. Further, there are no allegations in the complaint that Residents, as opposed to any and all citizens of this country, are in

---

13. An example of the kind of restricted liberty that will create liability in a state can be found in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989). In that case, the police arrested an intoxicated driver, impounded his car and left his passenger stranded in a high-crime area in the middle of the night. The court held that the police could be held liable for creating this danger to a person in its custody. Even there, one of the judges dissented, contending that the majority misapplied *DeShaney*.

14. It stated as follows:

> However, because may state activities have the potential to increase an individual's risk of harm, we require plaintiffs alleging a constitutional tort under § 1983 to show "special danger." ... The victim faces "special danger" where the state's actions place the victim specifically at risk, as distin-

guished from a risk that affects the public at large.

*Kallstrom*, 136 F.3d at 1066.

15. There are no allegations, for example, that the Water Authority, the Townships or Armstrong County have been identified as special targets for terrorists.

16. This also disposes of Residents' claim under Article I, Section 1 of the Pennsylvania Constitution. The Pennsylvania Supreme Court has held that

> the requirements of Article I, Section 1 of the Pennsylvania Constitution are not distinguishable from those of the [Due Process Clause of the] 14th Amendment ... [thus] we may apply the same analysis to both claims.

*Pennsylvania Game Commission v. Marich*, 542 Pa. 226, 229, 666 A.2d 253, 255 n. 6 (1995) (citation omitted).

imminent danger and at special risk. Most importantly, the state-created danger theory is a construct by which damages are awarded for constitutional torts. It is not used to nullify statutory law, and we will not do so here.

■ We return, then, to the question of whether the Townships properly exercised their police power when they enacted the Ordinances. It may be the case that a public water supply is more vulnerable to a terrorist attack, whether domestic or foreign, than is well water. It must be presumed, however, that the Townships weighed the various, and even competing, risks to public health when they mandated connection to the Water Authority's system. The fact that Residents do not agree with the public safety analysis of their elected officials who enacted the Ordinances does not mean that the Ordinances are irrational.[17]

Further, it does not advance the Residents' cause that they, personally, are in the "unique position to protect themselves from the consequences of a terrorist act that would poison, pollute, or disrupt the water supplied by the Water Authority." Residents' Brief at 7. The Ordinances were enacted to promote the Townships' legitimate interest in a safe public water supply for the public generally. Residents may have safe sources of on-site water, but other persons in the Townships are not so fortunate. In *Hatfield Township v. Lansdale Municipal Authority*, 403 Pa. 113, 168 A.2d 333 (1961) our Supreme Court recognized that it is appropriate for a local government to balance the needs of a total community for clean and safe water against a property owner's customary private water well supply.

Residents' challenge to the constitutionality of the Ordinances fails. Our decision in *Borough of Hughesville* applies with equal force here. The mandate to join the Water Authority's system does not violate substantive due process, as guaranteed by the 14th Amendment, or the right to life, as guaranteed by the Pennsylvania Constitution. As was found in *Stern*, mandatory connections to public water systems are, on their face, classic examples of necessary health and welfare legislation. We hold that Residents failed to state a claim with respect to the constitutionality of the Ordinances. Accordingly, we affirm the trial court.

### ORDER

AND NOW, this 28th day of September, 2004, the decision of the Court of Common Pleas of Armstrong County, dated December 30, 2003, is hereby affirmed.

---

**17.** As noted in electronic correspondence dated March 21, 2003, from John Hines to Donna Gail that is attached to the Complaint, the Pennsylvania Department of Environmental Protection has required water suppliers to take "steps that discourage or delay, detect and respond to incidents where contaminants can be introduced into the system. We have simple things like extra lighting, better locks or locking everything that should be locked, patrolling the infrastructure on a frequent and not predictable basis to more expensive measures such as video surveillance and telemetry to monitor for pressure, pH, residual, alkalinity, conductivity, etc. in real time." Exhibit C to Complaint.