CITY OF PHILADELPHIA and Lance Haver, Acting Insurance Public Advocate, Petitioners

v.

PENNSYLVANIA INSURANCE DEPARTMENT, Respondent.

Jules Ciamaichelo and Robert Stevens, Inc., Lawrence Herman, D.C., Nachas, Inc. and Jason H. Herman, Robert Petty and R.G. Petty Masonry, Philadelphia Citizens for Children and Youth, Pennsylvania Alliance for Retired Americans, Consumer Health Coalition, Philadelphia Unemployment Project, Action Alliance of Senior Citizens of Greater Philadelphia, Mon Valley Unemployed Committee, Service Employees International Union, Pennsylvania State Council, PennPIRG Education Fund, PHILA-POSH, Philadelphia Welfare Rights Organization, Citizens for Consumer Justice, Women's Law Project, Schuylkill Alliance for Health Care Access and Jobs With Justice, Petitioners

v.

Pennsylvania Insurance Department, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 15, 2005.
Decided Dec. 29, 2005.

Andrew S. Ross, Philadelphia, for petitioners, City of Philadelphia and Lance Haver, Acting Insurance Public Advocate.

Steven B. Davis and Sandra L. Ykema, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, PELLEGRINI, Judge (P.), and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Before this Court are two consolidated appeals from an order of the Commonwealth's Insurance Commissioner, M. Diane Koken, approving in part Applications for Approval of Reserves and Surpluses of over $4 billion by Capital Blue Cross,[1] Highmark, Inc.,[2] Hospital Service Associa-

---

1. Pursuant to the Insurance Commissioner's findings of fact in her decision, Capital Blue Cross is described as follows:

 CBC is a Pennsylvania domiciled non-profit hospital plan incorporated in 1938 and headquartered in Harrisburg, Pennsylvania, with five wholly owned for-profit insurance subsidiaries ... CBC is an independent licensee of the Blue Cross Blue Shield Association and operates under the Blue Cross service mark to offer hospital care coverage in central Pennsylvania and the Lehigh Valley. In addition, it offers physician services under the Blue Cross (not Blue Shield) service mark, through CAIC.

2. Highmark is described by the Insurance Commissioner in her findings of fact as follows:

 Highmark is a Pennsylvania domiciled non-profit health plan corporation, and was created by the consolidation of Medical Service Association of Pennsylvania, Inc. and Veritus, Inc. in 1996 and is headquartered in Pittsburgh, Pennsylvania. The predecessor companies were created in the 1930's. Highmark operates under all sections of the Health Plan Corporations Act, encompassing both hospital plans and professional health service plans. Highmark operates Highmark Blue Cross Blue Shield and Highmark Blue Shield, and has a number of wholly-owned or controlled insurance

tion of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, and Independence Blue Cross[3] (collectively, the Blue Plans). The parties appealing the approval—policyholders, subscribers and public interest groups, along with the City of Philadelphia (collectively, Challengers)—contend that the Insurance Commissioner approved the applications based upon a constitutionally infirm process, and that the Insurance Commissioner's order should be declared void and the matter transferred to the Pennsylvania Insurance Department for a constitutional proceeding.

This matter initially arose on August 3, 2002, when a notice was placed in the Pennsylvania Bulletin regarding the review process the Pennsylvania Insurance Department (Department) was beginning regarding the Blue Plans pertaining to their surplus and reserve levels of their hospital plans relating to hospital plan corporations. The Department then held a public informational hearing on September 4, 2002, in Harrisburg, Pennsylvania, to consider the reserve and surplus levels of each of the Blue Plans. Throughout 2002 and 2003, the Department also issued a series of data requests to each of the Blue

Plans. Apparently, after analyzing all of the information received, the Department concluded that the Blue Plans collectively held substantial reserve and surplus amounts, and there was a level at which accumulating additional surplus would be inefficient. Pursuant to the provisions of the Health Plan Corporations Act (HPC Act)[4], 40 Pa.C.S. §§ 6124 and 6329, on January 17, 2004, the Department issued a notice in the Pennsylvania Bulletin entitled *Reserve and Surplus Levels of Hospital Plan and Professional Health Service Plan Corporations; Application; Notice 2004–01*, directing the Blue Plans that they were required to submit applications for the approval of the reserves and surpluses they maintained under 40 Pa.C.S. §§ 6101–6127, relating to hospital plan corporations.[5] The notice also alerted the public of the application process and advised that the applications would be made available for public inspection and comment. In the notice, the Department indicated that the Blue Plans faced a variety of financial, economic and operating risks that required the maintenance of surplus to assure continued viability of their plans. Because there was disagreement as to how to measure the risk facing the Blue Plans,

subsidiaries, including KHPW and HealthGuard which provide managed care health insurance coverage. Highmark is an independent licensee of the Blue Cross Blue Shield Association and operates under the Blue Cross or Blue Shield service marks to offer hospital care coverage and professional health services throughout western and central Pennsylvania.

**3.** Independence Blue Cross is described by the Insurance Commissioner in her findings of fact as follows:

IBC is a Pennsylvania domiciled non-profit hospital plan corporation incorporated in 1938 and headquartered in Philadelphia, Pennsylvania. It has a number of wholly and partially owned or controlled insurance subsidiaries and is an independent licensee

of the Blue Cross Blue Shield Association. It operates under the Blue Cross service mark to offer hospital care coverage in the 5–county southeastern region of Pennsylvania. It partners with Highmark Blue Shield to provide professional health services coverage.

**4.** Act of November 15, 1972, P.L. 1063, *as amended*, 40 Pa.C.S. §§ 6101–6127.

**5.** In the Insurance Commissioner's decision, she states: "Throughout this report, 'reserves' means monies set aside to pay for incurred but unpaid claims; 'surplus' means the capital that remains after all liabilities have been deducted from a company's assets." (Insurance Commissioner's February 9, 2005 decision at 4, note 5.)

the Department felt it was necessary to determine and monitor whether the levels of surplus were adequate to protect the continued viability of the Blue Plans.[6] The Department stated that it had held a public informational hearing on September 4, 2002, to gather information on the reserve and surplus levels of the Blue Plans and, as a result, had determined that they held in excess of $2.4 billion in reserves of unpaid liabilities and $3.5 billion in surplus as of December 31, 2002. However, it could not determine whether current surplus levels were excessive based on its current information because the Blue Plans had sought rate increases on various insurance products since the September 4, 2002 informational hearing. Therefore, the Department required the Blue Plans to submit an application for approval of their reserves and surpluses by April 15, 2004.[7]

The Blue Plans timely filed their applications and requested approval of reserves and surpluses from the Insurance Commissioner.[8] On August 6, 2004, according to the Department, it issued a second notice advising the public of the Blue Plans' applications and setting a 30–day public comment period to commence on August 16, 2004, and end on September 14, 2004. It stated that this period was extended by 10 days to September 24, 2004.[9] The com-

6. The Department explained its method of determining whether the levels of surplus were adequate as follows:

> The National Association of Insurance Commissioners (NAIC) has developed a tool, known as Risk Based Capital (RBC), as a formulaic approach to establishing capital requirements for insurers, while accounting for the risks associated with the business operations for each insurer. The NAIC RBC formula ratios an insurer's total adjusted surplus to its measured authorized control level surplus. Calculating RBC ratios necessarily requires accurate statement of proper reserves. Utilizing the RBC scoring methodology, the national Blue Cross Blue Shield Association has identified an RBC ratio of 375% of Authorized Control Level to constitute an "Early Warning Level," at which point monitoring may be considered by that organization. On a countrywide basis, the Blues were operating at a system-wide average RBC of 628% as of June 30, 2002, and approximately 60% of premiums were written by Blues plans operating at an RBC ratio of 600% or less.
> Department's brief at.

7. Each Blue Plan was required to provide the following information:

> (a) state what reserve levels it and all of its insurance subsidiaries are holding and what surplus levels it and all of its insurance subsidiaries are currently maintaining;
> (b) state the maximum RBC ratio within the 350% to 650% range that is appropri-ate, and explain the rationale for that maximum ration;
> (c) identify the Plan's funds dedicated, allocated or expended for charitable purposes in 2002 and 2003, and those planned for 2004 through 2006; and
> (d) provide a proposed business plan explaining how any maintained surplus that results in an RBC ratio that is in excess of the maximum RBC ratio will be fairly and equitably distributed to benefit Plan participants and the Commonwealth's underinsured and uninsured citizens in a manner befitting charitable and benevolent institutions such as the Blues Plans.

8. In separate actions, Capital Blue Cross and Blue Cross of Northeastern Pennsylvania filed suit against the Insurance Commissioner as did Highmark because they did not want their applications made available to the public. *See Capital Blue Cross, et al v. Koken*, No. 172 M.D. (Pa.Cmwlth.2004) and *Highmark v. Insurance Department*, No. 47 M.D. (Pa.Cmwlth. 2004). In unreported decisions, we held that the application process could proceed and that with certain exceptions, the application materials could be made available for public comment.

9. These are the dates that have been provided by the Insurance Commissioner in her brief. However, we realize that the 30–day period should have been from August 16, 2004, through September 16, 2004, and an additional 10 days would have ended on September 26, 2004.

ments came. During that time, the Department received 329 public comments from numerous individuals in addition to the policyholders, subscribers and the various public interest groups expressing concern and outrage at the Blue Plans' multi-billion dollar surplus and offering alternatives for reducing that figure.[10] The Department shared all the comments it received with the Blue Plans. The Blue Plans submitted responses to the public comments to the Department.

In deciding whether to approve the applications, the Insurance Commissioner claimed that she considered the public comments and the Blue Plans' responses; undertook an extensive actuarial, accounting and legal analysis to determine an appropriate surplus range for the Blue Plans; considered the Blue Plans' status as non-profit corporations, including the inability of the Blue Plans to access capital through the issuance of equity securities and their insulation from market forces and their status as the insurer of last resort; considered the benefits derived by the Blue Plans from the statutory exemption from taxation by the state and its political subdivisions; analyzed proposed alternative means of measuring surplus as suggested by the Blue Plans; considered the best means of measuring surplus as well as the corporate structure of the Blue

Plans; and considered the Blue Plans' short-term and long-term solvency requirements in the face of the respective economies, competition and Pennsylvania legal requirements. The Insurance Commissioner did not, however, allow a public hearing on the matter before an independent hearing examiner, did not allow discovery, and did not allow any party to present evidence or cross-examine witnesses. On February 9, 2005, she issued a determination and order approving all four Blue Plans' applications for approval of reserves and surpluses finding that the financial solvency and strength of the Blue Plans was a matter within the Department's discretion.

In response to the Insurance Commissioner's order, on March 11, 2005, two petitions for review were filed with this Court: one by a collective group of three policyholders, four Blue Cross subscribers and 14 public interest groups;[11] the other by the City of Philadelphia (City) through its acting Public Insurance Advocate based on its status as an employer who pays premiums to Independence Blue Cross. All of the parties argue that the maintenance of these surpluses are excessive, but the public interest groups further contend that the surpluses could be used for coverage of individuals without health insurance

---

10. For example, one individual from the Pittsburgh area wrote:

> The current Highmark surplus of 2.2 billon is incredible. On top of that they have demanded 15 to 20% annual premium increases. They are using this money to buy hospitals and since they enjoy "non-profit" status, no real estate tax is paid to Allegheny County, City of Pgh and Pgh Public Schools, this at a time when Pittsburgh is in financial crisis.
> Your office should immediately do the following:
> 1. Freeze Highmark premiums at the current level until 2010.

> 2. Peg any increase after that to cost-of-living. Increase granted by social security.
> 3. Revoke Highmark's non-profit status.
> 4. Make all financial and payroll information by Highmark to be published as public record every year.

11. Some of those policyholders previously challenged the maintenance of these surpluses by the Blue Plans in various actions that were either dismissed or stayed pending appeal. Challenges to those dismissals are currently on appeal before the Pennsylvania Supreme Court which granted allocatur in *Ciamaichelo v. Independence Blue Cross*, 574 Pa. 749, 829 A.2d 1158 (2003).

or to provide more affordable health insurance to those who only have minimal coverage.

As to the harm they have suffered or will suffer as a result of the excess surpluses, the policyholders and subscribers allege harm due to the Blue Plans keeping funds that allegedly belong to them from payment of their premiums, and the public interest groups allege injuries resulting from the Blue Plans' failure to provide enough of their capital to their individual causes. The City of Philadelphia explains that it is harmed due to:

> [T]he direct cost to the City of millions of dollars collected in premiums and deposited into the statutory surplus accounts maintained by Independence Blue Cross (IBC) and its subscribers (policyholders) against the risks of insolvency. More specifically, the city has appealed the Department's determination that IBC's statutory surplus falls below a "sufficient level" as defined by the Department. The effect of this determination is to shield IBC from any claim by policyholders for divestiture of excess surplus and, further and more troubling, to entitle IBC to *levy* additional premiums in order to build even more surplus. (City's brief at 1.)

The City further argues that while balancing its interest in solvency, it "also has a strong interest in avoiding excess premiums, to wit, payments made by the City with taxpayer funds which exceed all legitimate requirements for the financial protection of its insured employees and their families." (City's brief at 2.) The City

contends that under the Insurance Commissioner's order, IBC is not only permitted to retain every dollar that the parent company and its subsidiaries and affiliates hold in surplus, but it is also permitted to add new surplus to its account by levying additional charges for "risk and contingencies" in premiums.

In any event, in both of their petitions, the parties argue that they were entitled to an "administrative hearing" pursuant to Section 6124(b) of the HPC Act, 40 Pa.C.S. § 6124(b).[12] By an "administrative hearing," they mean a public adversarial hearing or full-blown "due process" hearing which would have allowed them to first conduct discovery and, at the actual hearing, to cross-examine and confront adverse witnesses and Blue Cross officials. They also argue that such a hearing would have had to have been conducted by an independent, impartial hearing examiner. Capital Blue Cross filed a notice to intervene as of right which was granted. We have consolidated the two cases for consideration.

■ The central issue in this case is whether Challengers have a right to a full-blown, due process hearing. Section 6124(b) of the HPC Act, 40 Pa.C.S. § 6124(b), sets forth the procedure to be used to consider an application concerning reserves and who has a right to a hearing. That section provides:

> Every application for such approval shall be made to the department in writing and shall be subject to the provisions of subsections (c) through (f) of section 6102 of this title (relating to certification

---

12. The City argues that it was entitled to a hearing pursuant to Section 504 of the Administrative Agency Law (AAL), 2 Pa.C.S. § 504. That section provides:

No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be

heard. All testimony shall be stenographically recorded and a full and complete record shall be kept of the proceedings.

Because the Blue Plans' applications were filed under the HPC Act, any remedy that the City or any other aggrieved party would have would only be available to them under this Act.

of hospital plan corporations) **except that the department may substitute publication in the Pennsylvania Bulletin of notice of reasonable opportunity to submit written comments for publication of opportunity for hearing in any case where the right to an oral hearing is not conferred by the Constitution of the United States or the Constitution of Pennsylvania.** Within 60 days after the filing of the application the department shall approve or refuse such application. (Emphasis added.)

Under this provision, the Insurance Commissioner is not required to hold a hearing unless that right is conferred upon a party by either the United States or Pennsylvania Constitutions. If such a right is conferred upon the party, then the party has standing to have a full-blown, due process hearing and may appeal any adverse determination. The question then is when are such hearings required by the United States and Pennsylvania Constitutions and are any of those situations applicable to this case.

 The due process standards of the United States [13] and Pennsylvania [14] Constitutions are essentially the same. *See Commonwealth v. Louden*, 569 Pa. 245, 803 A.2d 1181 (Pa.2002); *Commonwealth v. Barud*, 545 Pa. 297, 681 A.2d 162 (1996); *Johnston v. Township of Plumcreek*, 859 A.2d 7 (Pa.Cmwlth.2004). Under the due process provisions of the 14th Amendment, a person has a right to a due process hearing when the following two-prong test is met: the challenged action has caused that party an injury in fact, economic or otherwise, and when the interest asserted by the plaintiff is within the zones of interests sought to be protected or regulated by the statute or constitutional guarantee in question. *Pennsylvania Environmental Council, Inc. v. Bartlett*, 315 F.Supp. 238 (M.D.Pa.1970), *aff'd*, 454 F.2d 613 (3d Cir. Pa.1971). Stated a bit differently, under the Pennsylvania Constitution, a person is only entitled to due process protections when there is a legitimate claim of entitlement to a property interest or other protected interest. *Graham v. Pennsylvania State Police*, 160 Pa.Cmwlth. 377, 634 A.2d 849 (1993). To summarize, under either Constitution, once a party is determined to have a property interest or interest in the outcome of the litigation, that person has standing to challenge the governmental action and is entitled to a due process hearing.[15]

---

**13.** Article 1, Section 1 of the 14th Amendment to the United States Constitution provides: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**14.** Regarding the Pennsylvania Constitution, this Court has found that "the guarantee of due process, in Pennsylvania jurisprudence, emanates from a number of provisions of the Declaration of Rights, particularly Article 1, Sections 1, 9, and 11 of the Pennsylvania Constitution." *Millcreek Manor v. Department of Public Welfare*, 796 A.2d 1020, 1028 (Pa.Cmwlth.2002). Article 1, which is applicable here, provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Article 9 deals with "Rights of accused in criminal prosecutions" and Article 11 deals with "Courts to be open; suits against the Commonwealth."

**15.** To put it another way, a party that has standing has a right to a due process hearing. In *Maillie v. Greater Delaware Valley Health*

Because the policyholders, subscribers and the City contend that the rates they pay as policyholders give them standing, i.e., property rights, the question then is whether they have a sufficient property interest that requires the Insurance Commissioner to give them a full-blown, due process hearing because if the Blue Plans disgorge their purported excess reserves, that may have an effect on reducing the premium rates they pay for health insurance for themselves or their employees. We addressed a similar question in *Consumer Education and Protective Association International, Inc. v. Philadelphia Water Department Commissioner*, 133 Pa. Cmwlth. 148, 575 A.2d 160, *petition for allowance of appeal granted*, 526 Pa. 641, 584 A.2d 322 (1990), *order affirmed*, 528 Pa. 600, 600 A.2d 189 (1992). In that case, we addressed whether ratepayers, who did not have a statutory right to a hearing, had a due process right to challenge their rates. In holding that they did not, we stated:

> As pointed out by the City in its brief to this Court, there is a significant body of federal case law on this subject. Feder-

al courts have consistently held that ratepayers do not have a sufficient property interest in rates to invoke the procedural due process protections of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV. See e.g. *Holt v. Yonce*, 370 F.Supp. 374 (1973), aff'd, 415 U.S. 969, 94 S.Ct. 1553, 39 L.Ed.2d 867 (1974); *Georgia Power Project v. Georgia Power Co.*, 409 F.Supp. 332 (N.Dist. Ga.1975); *Sellers v. Iowa Power and Light Co.*, 372 F.Supp. 1169 (S.Dist.Iowa 1974) (welfare recipients have no due process rights in rates.)

An examination of Pennsylvania case law leads to the same conclusion that ratepayers do not have a property interest in rates and ratemaking.

\* \* \*

Ratepayers may participate in the process, not because of a vested property right, but because the statutory scheme provides a vehicle for such participation. *Id.* at 163–164, 600 A.2d 189.

The rationales set forth in the federal cases cited in *Consumer Education* were

---

Care, Inc., 156 Pa.Cmwlth. 582, 628 A.2d 528 (1993), we addressed what interest a party must have to be entitled to participate in a proceeding. Citing *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975), we explained: "The test for standing is that a party must have a direct interest in the subject matter of the litigation, which must be substantial and immediate, rather than a remote consequence of the judgment." *Id.* at 532, 346 A.2d 269. "A person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of this challenge. *Id.* at 192, 346 A.2d at 280 (footnote omitted.) A party 'must show' a sufficiently close causal connection between the challenged action and the asserted injury to qualify the interest as 'immediate' rather than 'remote.' *Id.* at 202, 346 A.2d at 286." *Maillie*, 628 A.2d at 532. In *Maillie*, we held that subscribers of an

HMO did not have standing to bring a class action against the HMO's directors who allegedly used their positions to become unjustly enriched by converting the HMO from a non-profit to a for-profit corporation and then purchasing it for insufficient consideration and reselling it for profit. Noting that there was no evidence that any class member suffered *any* harm, let alone immediate harm, we stated that just because there was an allegation that the defendants might have been unjustly enriched, it was not a linking factor between the class and its health insurance coverage—"the only benefit to which the class was entitled." *Id.* at 592, 628 A.2d 528. Though *Maillie* involved whether a party had the right to bring an action and this involved the right to a due process hearing before an administrative agency, no one has argued that that their health coverage has changed or medical services have declined as a result of the excessive surpluses.

based on the proposition that at common law, a public utility like an unregulated seller had the right in the first instance to change its rates at will and that utility customers had no vested rights to fixed rates. Having no right to a fixed rate or any rate, the federal courts held that ratepayers have no right to a property interest of an existing rate or the right to have that rate lowered. Consequently, unless the right to a hearing is provided by statute, they have no constitutionally protected due process rights to a hearing. Similarly, policyholders do not have a property right to have their premiums stay the same or, what's at issue here, the even more attenuated claim that their premiums would be lowered if they claim excess reserves are disgorged for premium reductions. Because they have no protected property interest in their rates, the policyholders, subscribers and the City have no due process rights, either under the federal or state constitution, to a due process hearing or standing to appeal the findings made by the Insurance Commissioner that the surpluses are not excessive.

 If the policyholders, subscribers and the City who pay premiums do not have standing, neither do the public interest groups who contend that the surpluses could be used for coverage of individuals without health insurance or to provide more affordable health insurance to those who only have minimal coverage. Even though public interest groups have identified social needs that could be addressed with those excessive reserves, those needs are not a substitute for an identifiable

property interest necessary in order to be entitled to a due process hearing or to appeal the Insurance Commissioner's determination that the capital reserves of the Blue Plans are not excessive.[16]

Consequently, because Challengers do not have the right to a hearing, they do not have standing to appeal the Insurance Commissioner's determination. Accordingly, their petitions for review are quashed.

Judge LEAVITT did not participate in the decision of this case.

### ORDER

AND NOW, this *29th* day of *December*, 2005, the petitions for review are quashed.

---

16. The policyholders, subscribers and public interest groups contend that they have standing and are entitled to a hearing relying upon this Court's decision in *Philadelphia County Medical Society et al. v. Kaiser, Commissioner, Insurance Department of Pennsylvania,* 699 A.2d 800 (Pa.Cmwlth.1997). However, that case centered more on whether there was a final appealable order rather than on whether the opponents to a Department action had standing, i.e., a right to a due process hearing. Because it was not a final order, we remanded for a hearing of whether the party challenging the action had a sufficient direct interest in the proceeding to have standing.